922 So.2d 1113 (2004)
Joseph BUJOL, III, et al.
v.
ENTERGY SERVICES, INC., et al.
Don A. Perkins, et al.
v.
Entergy Services, Inc., et al.
Nos. 2003-C-0492, 2003-C-0502.
Supreme Court of Louisiana.
May 25, 2004.
Rehearing Granted October 29, 2004.
Opinion Granting Rehearing January 19, 2006.
Order Denying Consideration March 10, 2006.
*1116 Sidney W. Degan, III, Degan, Blanchard & Nash, New Orleans; Russell D. Holwadel, Adams, Johnson & Oreck; Louis C. Lacour, Jr., Mark C. Surprenant, Robert Markle, Adams & Reese, New Orleans, for Applicant (No. 2003-C-0492).
David F. Bienvenu, Hoffman, Siegel, Seydel, Bienvenu & Centola, New Orleans; Brandon S. Andrews, Paul H. Due, Baton Rouge, Patrick W. Pendley, Plaquemine, David W. Robertson, Donald W. Price, Due, Price, Guidry, Piedrahita & Andrews, Baton Rouge; Hon. Harry T. Lemmon, New Orleans, Victor L. Marcello, Donald T. Carmouche, John H. Carmouche, Talbot, Carmouche & Marcello, Gonzales; Edward J. Walters, Jr., Darrell J. Papillion, Moore, Walters, Thompson, Baton Rouge; George B. Hall, Jr., Phelps Dunbar, New Orleans; H. Lee Leonard, Leonard & Leonard, Lafayette; Lyon H. Garrison, New Orleans, Preston & Cowan; Stephen W. Glusman, Glusman, Moore, Arbour, Baton Rouge; William G. Schopf, Paula E. Litt, Schopf & Weiss, Chicago, IL; John P. Wolff, III, Keogh, Cox & Wilson, Baton Rouge; Jerry L. Saporito, Saporito & Sledge, New Orleans; Thomas E. Schwab, Barkley & Thompson, New Orleans; Michael B. Satz, Sedgwick, Detert, Moran & Arnold, Chicago, IL; Marian M. Berkett, Robert E. Kerrigan, Jr., Joseph L. McReynolds, Deutsch, Kerrigan & Stiles, New Orleans; John M. Veron, Scofield, Gerard, Veron, Lake Charles; William S. McKenzie, Taylor, Porter, Brooks, Baton Rouge; Paul D. Palermo, Gregg L. Spyridon, Spyridon, Koch & Palermo, Metairie; Ralph S. Hubbard, III, Lugenbuhl, Burke, Wheaton, Peck, New Orleans; L. Phillip Canova, Jr., Canova & Delahaye, Plaquemine; James M. Garner, Sher, Garner, Cahill, Richter, New Orleans, for Respondent (No. 2003-C-0492).
Marian M. Berkett, Robert E. Kerrigan, Jr., Joseph L. McReynolds, Deutsch, Kerrigan & Stiles, New Orleans; Thomas E. Schwab, Barkley & Thompson, New Orleans; Michael B. Satz, Sedgwick, Detert, Moran & Arnold, Chicago, IL, for Applicant (No. 2003-C-0502).
Sidney W. Degan, III, Degan, Blanchard & Nash, New Orleans; Russell D. Holwadel, Adams, Johnson & Oreck; Louis C. Lacour, Jr., Mark C. Surprenant, Robert Markle, Adams & Reese, New Orleans; David F. Bienvenu, Hoffman, Siegel, Seydel, Bienvenu & Centola, New Orleans; Brandon S. Andrews, Paul H. Due, Baton Rouge, Patrick W. Pendley, Plaquemine, David W. Robertson, Donald W. Price, Due, Price, Guidry, Piedrahita & Andrews, Baton Rouge; Hon. Harry T. Lemmon, New Orleans, Victor L. Marcello, Donald T. Carmouche, John H. Carmouche, Talbot, *1117 Carmouche & Marcello, Gonzales; Edward J. Walters, Jr., Darrell J. Papillion, Moore, Walters, Thompson, Baton Rouge; George B. Hall, Jr., Phelps Dunbar, New Orleans; H. Lee Leonard, Leonard & Leonard, Lafayette; Lyon H. Garrison, New Orleans, Preston & Cowan; Stephen W. Glusman, Glusman, Moore, Arbour, Baton Rouge; William G. Schopf, Paula E. Litt, Schopf & Weiss, Chicago, IL; John P. Wolff, III, Keogh, Cox & Wilson, Baton Rouge; Jerry L. Saporito, Saporito & Sledge, New Orleans; John M. Veron, Scofield, Gerard, Veron, Lake Charles; William S. McKenzie, Taylor, Porter, Brooks, Baton Rouge; Paul D. Palermo, Gregg L. Spyridon, Spyridon, Koch & Palermo, Metairie; Ralph S. Hubbard, III, Lugenbuhl, Burke, Wheaton, Peck, New Orleans; L. Phillip Canova, Jr., Canova & Delahaye, Plaquemine; James M. Garner, Sher, Garner, Cahill, Richter, New Orleans, for Respondent (No. 2003-C-0502).
Esteban Herrara, Jr., Charles S. McCowan, Jr., Baton Rouge, Julie P. Silbert, New Orleans, for Louisiana Chemical Ass'n and American Chemistry Counsel (Amicus Curiae).
Edward T. Hayes, Jerry L. Saporito, New Orleans, for Royal Indem. Co. (Amicus Curiae).
Thomas J. Simpson, for Agricultural Ins. Co. and Lexington Ins. Co. (Amicus Curiae).
John P. Guillory, H. Lee Leonard, Lafayette, for Reliance Ins. Co. of Illinois (Amicus Curiae).
James A. Babst, New Orleans, for Louisiana Ass'n of Business and Industry (Amicus Curiae).
Adams & Reese, LLP, Mark C. Surprenant, Louis Charles LaCour, Jr., Robert N. Markle, Adams & Johnson, Russell D. Holwadel, Degan, Blanchard & Nash, Sidney Wallis Degan, III, Jim Rowell, New Orleans, Counsel for Applicant (2003-C-0492), on Rehearing.
Simon, Peragine, Smith & Redfean, LLP, David F. Bienvenu, Due, Price, Guidry, Piedrahita & Andrews, Paul H. Due, Donald Wayne Price, Baton Rouge, Brandon Scott Andrews, Patrick W. Pendley, Plaquemine, David Wyatt Robertson, Baton Rouge, Herman, Herman, Katz & Cotlar, Russ Michel Herman, New Orleans, Talbot, Carmouche & Marcello, APLC, Victor L. Marcello, Donald T. Carmouche, John Hogarth Carmouche, Gonzales, Harry T. Lemmon, Moore, Walters, Thompson, Thomas, Papillion & Cullens, Edward Joseph Walters, Jr., Darrel James Papillion, Richards Law Firm, APLC, Keith Patrick Richards, Baton Rouge, Phelps Dunbar, LLP, George Barlett Hall, Jr., New Orleans, Leonard & Leonard, H. Lee Leonard, Leonard & Leonard, Ltd., Melvin Alan Eiden, Lafayette, Christopher H. Hebert, Preston & Cowan, LLP, Lyon H. Garrison, Glusman, Broyles & Glusman, Stephen W. Glusman, Baton Rouge, Schopf & Weiss, Paula E. Litt, William G. Schopf, Chicago, IL, Keogh, Cox & Wilson, John Powers Wolff, III, Baton Rouge, Saporito Law Firm, LLC, Jerry Leonard Saporito, Barkley & Thompson, LC, Thomas Edgard Schwab, New Orleans, Sedgwick, Detert, Moran & Arnold, Michael B. Satz, Chicago, IL, Deutsch, Kerrigan & Stiles, LLP, Robert Emmett Kerrigan, Jr., Joseph L. McReynolds, Marian Mayer Berkett, New Orleans, Taylor, Porter, Brooks & Phillips, LLP, William Shelby McKenzie, Baton Rouge, Spyridon, Koch, Palermo & Dornan, LLC, Gregg L. Spyridon, Paul D. Palermo, Metairie, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Ralph Shelton Hubbard, III, New Orleans, Canova & DeLahaye, L. Phillip Canova, Jr., Plaquemine, Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC, James Michael Garner, New Orleans, *1118 Counsel for Respondent (2003-C-0492), on Rehearing.
Esteban Herrera, Jr., Charles S. McCowan, Jr., Baton Rouge, Julie Parelman Silbert, New Orleans, Counsel for Louisiana Chemical Association (Amicus Curiae), on Rehearing.
Edward Thomas Hayes, Jerry Leonard Saporito, Counsel for Roy Indemnity Company (Amicus Curiae), on Rehearing.
Thomas Justin Simpson, Counsel for Lexington Insurance Company and Hartford Insurance Company (Amicus Curiae), on Rehearing.
John Patrick Guillory, H. Lee Leonard, Lafayette, Counsel for Reliance Insurance Company/Illinois (Amicus Curiae), on Rehearing.
James Anthony Babst, New Orleans, Counsel for Louisiana Association/Business & Industry (Amicus Curiae), on Rehearing.
Barkley & Thompson, LC, Thomas Edgard Schwab, New Orleans, Sedgwick, Detert, Moran & Arnold, Michael B. Satz, Chicago, IL, Deutsch, Kerrigan & Stiles, LLP, Robert Emmett Kerrigan, Jr., Joseph L. McReynolds, Marian Mayer Berkett, New Orleans, Counsel for Applicant (2003-C-0502), on Rehearing.
Adams & Reese, LLP, Mark C. Surprenant, Louis Charles LaCour, Jr., Robert N. Markle, Adams & Johnson, Russell D. Holwadel, Degan, Blanchard & Nash, Sidney Wallis Degan, III, Jim Rowell, New Orleans, Simon, Peragine, Smith & Redfean, LLP, David F. Bienvenu, Due, Price, Guidry, Piedrahita & Andrews, Paul H. Due, Donald Wayne Price, Baton Rouge, Brandon Scott Andrews, Patrick W. Pendley, Plaquemine, David Wyatt Robertson, Baton Rouge, Herman, Herman, Katz & Cotlar, Russ Michel Herman, New Orleans, Talbot, Carmouche & Marcello, APLC, Victor L. Marcello, Donald T. Carmouche, John Hogarth Carmouche, Gonzales, Harry T. Lemmon, Moore, Walters, Thompson, Thomas, Papillion & Cullens, Edward Joseph Walters, Jr., Darrel James Papillion, Richards Law Firm, APLC, Keith Patrick Richards, Baton Rouge, Phelps Dunbar, LLP, George Barlett Hall, Jr., New Orleans, Leonard & Leonard, H. Lee Leonard, Leonard & Leonard, Ltd., Melvin Alan Eiden, Lafayette, Christopher H. Hebert, Preston & Cowan, LLP, Lyon H. Garrison, Glusman, Broyles & Glusman, Stephen W. Glusman, Baton Rouge, Schopf & Weiss, Paula E. Litt, William G. Schopf, Chicago, IL, Keogh, Cox & Wilson, John Powers Wolff, III, Saporito Law Firm, LLC, Jerry Leonard Saporito, Taylor, Porter, Brooks & Phillips, LLP, William Shelby McKenzie, Baton Rouge, Spyridon, Koch, Palermo & Dornan, LLC, Gregg L. Spyridon, Paul D. Palermo, Metairie, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Ralph Shelton Hubbard, III, New Orleans, Canova & DeLahaye, L. Phillip Canova, Jr., Plaquemine, Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC, James Michael Garner, New Orleans, Counsel for Respondent (2003-C-0502), on Rehearing.
Esteban Herrera, Jr., Charles S. McCowan, Jr., Baton Rouge, Julie Parelman, Silbert, New Orleans, Counsel for Louisiana Chemical Association (Amicus Curiae), on Rehearing.
Edward Thomas Hayes, Jerry Leonard Saporito, Counsel for Roy Indemnity Company (Amicus Curiae), on Rehearing.
Thomas Justin Simpson, Counsel for Lexington Insurance Company and Hartford Insurance Company (Amicus Curiae), on Rehearing.
John Patrick Guillory, H. Lee Leonard, Lafayette, Counsel for Reliance Insurance Company/Illinois (Amicus Curiae), on Rehearing.
*1119 James Anthony Babst, New Orleans, Counsel for Louisiana Association/Business & Industry (Amicus Curiae), on Rehearing.
VICTORY, J.[*]
We granted these writ applications to determine (1) whether the evidence presented was sufficient to support the jury's conclusion that a parent corporation, Air Liquide, S.A. ("ALSA"), assumed the duty for the safety of a plant owned by a subsidiary corporation, Air Liquide America Corporation ("ALAC"), and, if so, (2) whether the parent corporation may be cast in judgment for exemplary damages pursuant to the provisions of repealed La. C.C. art. 2315.3, as interpreted by this Court in Ross v. Conoco, 02-0299 (La.10/15/02), 828 So.2d 546. After a review of the record and the applicable law, we reverse the jury's finding that ALSA assumed the duty for safety at ALAC's plant and therefore reverse the award of compensatory damages for breach of that duty. We further reverse the jury's award of exemplary damages as the plaintiffs are not entitled to such damages under the applicable law.

FACTS AND PROCEDURAL HISTORY
ALSA has a worldwide air-separation business, headquartered in France, with facilities in more than 60 countries. In 1986, American Air Liquide, an ALSA subsidiary, acquired Big Three Industries, Inc. ("Big Three"), a major oxygen pipeline systems operator in the United States which operated air-separation plants throughout the Gulf South, including a plant in Plaquemine, Louisiana. The Plaquemine plant was constructed in 1977, and was operated under the Big Three name until 1994, when Big Three was merged with another ALSA subsidiary, Liquid Air Corporation. As a result of the merger, the newly formed company became ALAC. Though ALSA is the ultimate majority shareholder of ALAC, it is not its direct parent. Through a mechanism described as "cascading ownership," ALSA owns the majority of shares of Air Liquide International, S.A., which owns the majority of shares of American Air Liquide, Inc., which owns the majority of shares of AL American Holdings, which owns the shares of ALAC.
On April 6, 1994, a power failure occurred at the air-separation facility located in Plaquemine, owned and operated by ALAC.[1] The facility, which consisted of four air separation plants, was temporarily shut down as a result of the "voltage sag," and efforts were made to restart the plants once the power was restored. Plaintiff, Don Perkins, was working at the facility when the facility shut down. Plaintiff, Joseph Bujol and decedent, Ray Hracek, were among the employees who were called in to restart the plants.
The evidence reveals that three of the four plants had been restarted when a malfunction was noted in an automatic pressure control valve of an oxygen pipeline distribution system located in the facility's let-down station.[2] The automatic *1120 control valve was regulating differential pressures between a 700 psi oxygen pipeline supplying Exxon and a 400 psi pipeline supplying other customers. In order to address the problem with the automatic control valve, typically workers would close the manual valve which would cut the flow from the 700 psi pipe upstream from the automatic pressure control valve. This manual valve was a backup to the automatic pressure control valve. The automatic valve and the manual valve were located a few feet apart between the 400 and the 700 psi systems.
Hracek, the plant manager, went to the letdown station to attempt to correct the malfunctioning automatic control valve, and instructed Bujol and Perkins to close the manual valve, which was done by turning a large wheel. The wheel was difficult to turn and the manual valve normally took ten minutes for two people to close. Perkins and Bujol had turned the wheel approximately 180 degrees, when Hracek advised them to stop. They stepped toward the automatic valve and Hracek climbed inside the loop of piping that formed the let-down station while the other two men watched. They were close enough to the automatic control valve for Bujol to see it cycle open and then abruptly close. A flash fire immediately erupted from the automatic valve and all three employees were severely burned. Hracek, Bujol, and Perkins were transported to a local hospital in Plaquemine. Because of the severity of their injuries, they were immediately transported to the Burn Unit at Baton Rouge Medical Center. Hracek died of his injuries on April 11, 1994 and Perkins and Bujol suffered severe physical injuries as a result of the explosion. Following the accident, ALAC enlisted a team of investigators to delve into the matter and determine the cause of the flash fire, which revealed that the presence of foreign material and/or debris found within the oxygen piping system most likely contributed to the cause of the flash fire.[3]
ALAC paid workers' compensation benefits, but within a year of the accident, on March 10, 1995, Bujol, Perkins, and their families, and the adult children of Hracek[4] filed individual suits against Entergy Corporation, Gulf States Utilities Company, Louisiana Power and Light, ALAC, and Big Three Industries, Inc. ("Big Three"),[5] alleging, among other things, that ALAC and Big Three were liable for punitive damages under Billiot v. B.P. Oil, 93-1118 (La.9/29/94), 645 So.2d *1121 604.[6] The three suits were later consolidated. On the day that case was set for trial, the plaintiffs settled their Billiot claims with Big Three's liability carriers for $34,500,000. All claims against Big Three and their insurers were subsequently dismissed with prejudice. Plaintiffs also agreed to release the "uninsured liabilities" of ALAC "and any past or present parent, subsidiary of affiliated companies of any of them," while reserving their rights against the insurers.[7]
While the Perkins suit was pending, on March 7, 1996, the Bujol plaintiffs and the Perkins plaintiffs each filed suit against Entergy Services, Inc., a separate entity from the utility defendant sued in Perkins.[8] On March 10, 1997, the plaintiffs amended their petition to add as defendants ALSA and Liquid Air Engineering Corporation ("LAEC"),[9] and those parties' insurers, National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") and X.L. Insurance Company, Ltd. ("X.L."). The Hracek survivors intervened in the suit, which is the instant consolidated suit we are ruling on today.
Plaintiffs alleged that ALSA was negligent in: (1) failing to properly supervise the activities of the Plaquemine facility; (2) failing to prescribe proper maintenance and management practices at the facility; (3) failing to provide technical assistance to the facility; and (4) failing to provide proper management services to the facility.
The consolidated cases proceeded to trial, which commenced on April 12, 1999, and ended on April 22, 1999. In support of its theory that ALSA assumed the duty for safety at ALAC's plant and breached that duty resulting in plaintiffs' damages, plaintiffs introduced a document known as "Technical Instruction 84" ("TI 84")[10], issued by the "Direction Technique"[11] of *1122 ALSA to its subsidiaries in 1984 and entitled "Design, Fabrication, Operation and Maintenance of Oxygen Pipeline Networks."
The introductory section of TI 84 sets forth the following:
"Three factors are essential to ensure the reliability and safety of pipeline networks, namely:
Choice of materials and components,
Thorough cleanliness of installations
Strict compliance with fabrication guidelines and ad hoc procedures during construction, commissioning, operation, and maintenance,
Strict compliance with safety rules.
Some countries lay down statutory requirements and compliance with these is an absolute priority.
In some countries or groups of countries, professional bodies may also lay down guidelines based on common experience in the field and making for better pipeline construction and operation. Such bodies include:
CGA in the USA and Canada,
IGC in Europe,
BCGA in the UK,
BCI in West Germany,
SK in Japan.
In early 1983 in Europe, the IGC brought out a document 13/82 entitled THE TRANSPORTATION AND DISTRIBUTION OF OXYGEN BY PIPELINE. It is fairly complete and matches the rules to be respected throughout our Group. In the event of incompatibility with rules in force locally, the DIRECTION TECHNIQUE may be consulted to decide on the attitude to adopt.
IT 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks."
IT 84 contained numerous other provisions, including a section entitled "Protective walls and screens," which provided as follows:
"Following a number of serious accidents some years ago, we called for the use of a sophisticated system of walls forming protective walls and screens.
Today, less stringent solutions are possible in light of the following factors:
Experience acquired, especially with networks at 64 bars,
Confirmation that choice of equipment is correct,
Installation procedures ensuring high-quality clean installations,
Analysis of accidents since 1970 (when protective wall system was introduced).
For new installations which are up to standard, the only requirement is that operating personnel should be protected during manual opening or closing of gate valves when:
P D2 > 3 000
where:
P = effective pressure in bars
D = nominal diameter in cm.
In this case, provision must be made for a protective wall between the gate valve and the handwheel (see Figure 27 showing Type A Protection and Figure 29 in IGC Document 13/82).

*1123 Walls or screens have different protective functions. The measures to be taken in each case are set below:
a) Protection of operating personnel

As mentioned above, personnel opening or closing gate valves must be adequately protected. This problem may be obviated by using remote control systems.
b) Protection of maintenance personnel

Pipelines should be designed so that maintenance is readily possible after decompression of the sections in question.
The question of regular maintenance checks carried out with the pipeline still pressurized must be examined and strict procedural guidelines laid down.
...
e) Protection between pipelines

Protection between pipelines is not indispensable. However, for the same reason as there are several different pipelines, it may be sensible to provide for shielding walls between each (possible reasons include the large size of a pipeline, its key role, security of supply, possibility of maintenance and repairs, etc.)."
Various ALSA witnesses testified regarding the provisions of TI 84 and regarding whether ALSA had assumed the duty for safety at the ALAC plant. Louis Butherol, a longtime ALSA employee, now retired, was designated to testify at trial as the corporate representative for ALSA. At trial, Butherol testified that although "IT 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks," barrier walls were never "required," they were merely "recommended in certain circumstances." Butherol testified that the phrase "minimum requirements" was an incorrect translation of the French phrase "regle minimal," which means "minimum rule" or "guide." Butherol declined to render an opinion of whether barrier walls should have been installed at the Plaquemine plant because he was unfamiliar with the facility, as he had never visited the plant. He further testified that protective walls or screens were used around manual valves in oxygen let-down stations in the European plants but were never utilized in the United States. He testified that plants in Europe started using protective walls in the 1960's and 70's following a series of accidents, and the walls were put up while they obtained sufficient knowledge to better prepare and guard the installations. He further testified that each country has its own guidelines, such as the CGA in the U.S., which does not recommend the use of protective walls.
Claude Tronchon, the General Manager of Risk Management for ALSA at the time of trial and the CEO of ALAC from 1991-1993, testified that the general managers of each subsidiary all around the world have the full responsibility for safety at their respective subsidiaries. He testified that the general management of ALSA selects the CEO of each subsidiary, and therefore, if ALSA wanted to impose a particular safety or technical standard upon a subsidiary that refused to do so itself, it could dismiss the CEO of that subsidiary. However, he testified that ALSA never imposed any safety standard upon a subsidiary in this or any other manner because the subsidiary's management did so itself.
Tronchon also testified that TI 84 was not a requirement, stating that he had never applied the document as a requirement on any subsidiary. He further testified that when ALSA purchased Big Three, ALSA was not concerned with whether Big Three complied with the ALSA guidelines because Big Three was the number one pipeline systems operator in the U.S., had no accidents in 30 years of *1124 operations, was thought by ALSA to be the best in its class in terms of safety, and was complying with CGA guidelines. Finally, he testified that when he was president of ALAC, he knew Big Three and LAEC were not following the same safety guidelines as the ALSA plants in Europe, and never thought that they should because he had confidence in their level of safety and the fact that they were following the same safety guidelines as the rest of the U.S. companies. ALSA decided to completely rely on the quality of Big Three's engineers, personnel and safety record. He reasserted that each subsidiary is responsible for its own safety, made its own safety plan, had a blank check to spend money on safety, never needed approval from ALSA to spend money on safety or implement safety procedures, followed the safety rules of the country where it was located, and followed ALSA guidelines and recommendations if the subsidiary felt they were necessary.
Tronchon further testified about the differences between the valve systems used in Europe and the U.S. He testified that systems in the U.S. were simpler, had less components and used different types of valves. Plants in Europe used manual valves which were always under pressure and therefore barrier walls may be needed around them. Plants in the U.S. used automatic valves that were ordinarily operated by remote from the control room and should not be worked on while under pressure. He further testified that whether a barrier wall is necessary depends on many circumstances, and that one drawback of using a barrier wall is that a person cannot see the condition of the valve, so if there is a leak, it can not be seen and a wall could prevent escape in case of a fire.
Tronchon was cross-examined using an ALSA document that stated "The [ALSA] Safety Director is responsible for reducing work-related accidents and developing illness prevention within the [ALSA] group of companies" and that "in addition, he checks with each subsidiary manager that the health and safety policy of the subsidiary is properly implemented and that the necessary inspections and orders are properly performed." Tronchon testified he was surprised to hear that the ALSA safety director did not do this at ALAC and he answered affirmatively when asked whether he was "shocked" that there were no such ALSA audits of the Plaquemine plant from 1986 to the time of the accident. He later explained that he meant he was surprised that no one from ALSA had gone to ALAC or Big Three to check that they had a safety organization within ALAC in place or had safety action plans which were consistent with the general guidelines of the ALSA group. He clarified that ALSA does not do technical safety audits, that each subsidiary does their own safety audits, and that ALSA audits each subsidiary only to see that they have rules and procedures in place which insures that safety is managed in the subsidiary. He further explained that ALSA does not "go in each and every site in order to check the safety of the site."
Gerard Campion, the Safety Director for ALSA, testified that after a plant explosion at one of its plants in Mons, Belgium in 1968, in which a plant manager was killed at a manual valve station, ALSA saw to it that barrier walls were built around manual valves at its subsidiaries' let-down stations.[12] He also testified about a fire at a *1125 let-down station in a Canadian-subsidiary which had manual valves, and where the barrier wall protected the employee from injury. He further testified that it was the responsibility of ALSA's Direction Technique to insure that the TI 84 was distributed to ALSA's subsidiaries.
At his deposition, which was admitted into evidence as an exhibit, Campion testified that as Safety Director for ALSA, he was in charge of collecting accident data and making statistics to propose a safety policy for ALSA, but that he did not have the authority to make the safety policy for each subsidiary, as each subsidiary exercised that authority. He testified that although he met with the safety director of ALAC, Dennis Mucha, several times, he never told him that ALAC should be following ALSA guidelines, as he exercised no authority over him. He further testified that ALAC never asked for assistance with a safety audit of the Plaquemine plant. Finally, he testified that if a CEO of a subsidiary decides not to follow an ALSA guideline, they do not need to notify ALSA.
Campion further explained why barrier walls were not necessary even under the ALSA guidelines. He testified that ALSA does not recommend barrier walls around automatic valves because workers do not go around automatic valves to work while they are under pressure. He testified that even though manual valves are located near the automatic valves, the manual valves are not made to operate there during normal conditions and are there to do the maintenance on those automatic valves. If a worker needs to work on an automatic valve, the worker needs to have a special working permit and follow a precise procedure from the plant manager. He testified that even if there had been barrier walls around the valve at the Plaquemine plant, the employees would still have suffered injury because they were working on the automatic valve under pressure and would have been between the valve and the wall when the flash fire occurred. He testified that he knew that the Big Three plants in the U.S. did not have barrier walls around the valves because the plants used automatic valves rather than manual valves.
Additionally, Eric Fortuit, the Director of ALSA's Direction Technique at the time of the accident, described the function of the Direction Technique as follows:
We write recommendations, and effectively for us it is important to know whether the recommendations are understood. Therefore, we make visits to the subsidiaries, we also help the subsidiaries to make the audits of their ... plant, because in the entire function they are responsible to make the audit of their ... own plant.
After the Plaquemine plant accident, ALSA made a "[Recommendation of Technical Safety] for all the subsidiaries, to remind them of the former technical instructions concerning the [barrier] walls . . ."
He testified that "[t]he policy of the group is that each subsidiary is responsible for the decisions taken, including safety. The ALSA group gives information and makes recommendations to help the subsidiary in all areas and we apply this policy. It consists of writing up recommendations to help the subsidiary to have better safety results and this policy has been shown to be efficient." ALSA "gives this information to the subsidiaries so that they can use them to the best, and by taking into account the local considerations, environment and the national regulations." He testified that it would be impossible for ALSA to write mandatory rules for its subsidiaries because of the "environment of each country, the evolution of the technology, and that the technology in the *1126 States and in Europe is not always the same." He testified that CGA supplied the local rules for U.S. plants and that, based on their expertise, CGA did not recommend barrier walls. Finally, he testified that in France, barrier walls were required by the technical standards and local rules and that therefore ALSA's French subsidiary was required to have barrier walls around its manual valves.
John Baird, the vice-president of legal and corporate affairs at ALAC, testified about the general corporate structure of ALAC and ALSA. He testified that the ALAC directors and officers act independently of ALSA and that ALAC pays its own salaries and sustains its own losses. He testified that ALSA has no control over the safety of ALAC employees or ALAC's safety operations, and that ALSA has done no safety audits of ALAC. He testified that ALSA does issue safety recommendations, which are sent to the CEO of the subsidiaries, who then sends them off to the various departments within his subsidiary, but that the subsidiaries outside of France have no obligation to follow the ALSA recommendations.
Following the presentation of the evidence, the jury returned a verdict form finding that (1) ALSA assumed a duty for safety at ALAC's Plaquemine plant; (2) ALSA was negligent, which negligence was a legal cause of the injuries suffered by plaintiffs; (3) plaintiffs' injuries were caused by ALSA's wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous substances; (4) LAEC was negligent, which negligence was a legal cause of the injuries suffered by plaintiffs; (5) the other defendants were not at fault for plaintiffs' injuries; and (6) Hracek was not guilty of comparative fault. The jury apportioned 80% of the fault to ALSA and awarded almost $40,000,000 in compensatory damages and $120,000,000.00 in punitive damages to plaintiffs.[13]
The court of appeal applied Section 324A of the Restatement (Second) of Torts to affirm the jury's finding that ALSA assumed a duty to provide for the safety of the employees at the Plaquemine plant. Bujol v. Entergy Services, Inc., 00-1621 c/w 00-1622 (La.App. 1 Cir. 8/14/02), 833 So.2d 947. The court of appeal affirmed the jury's determination that ALSA had assumed a duty for safety at the plant, stating:
The evidence satisfies the introductory portion of section 324A of the Restatement (Second) of Torts: ALSA undertook to render technical advice and impose requirements on its subsidiaries worldwide, including subsidiary ALAC. ALSA should have, but wantonly failed to, recognize its advice and safety requirements were necessary for the protection of ALAC's employees. As in Miller [v. Bristol-Myers Company], 168 Wis.2d at 890, 485 N.W.2d at 41, we conclude the parent corporation assumed a duty owed by the subsidiary to provide a safe workplace.
. . .
The liability of ALSA arose when it assumed the duty of developing and imposing mandatory safety requirements and then failed to exercise reasonable care in disseminating its safety requirements to ALAC and in enforcing its mandatory regulations in the former Big *1127 Three plants. We emphasize that ALSA's liability arises not because of a duty to control its subsidiary, but from its failure to enforce its mandatory safety requirements at the Plaquemine plant. ALSA voluntarily assumed a duty owed by ALAC to its employees for their safety.
Bujol, 833 So.2d at 964. The court of appeal also affirmed the finding that ALSA was liable for punitive damages.[14] Judge Lanier dissented from the portion of the decision which imposed liability for exemplary damages, opining that the evidence does not support the conclusion that ALSA was involved in the handling and/or transportation of the oxygen that caused the explosion. 833 So.2d at 985-993 (Lanier, J., dissenting).
The court of appeal denied defendant's applications for rehearing, finding that the application "raised no new issues that were not previously addressed and properly resolved in this court's decision...." 833 So.2d at 995. The appellate court granted plaintiffs' request for rehearing, finding that it committed legal error when it reduced the exemplary damages award by the percentage of the fault allocated to the Entergy defendants. Instead, the court of appeal cast ALSA with the full amount of exemplary damages. The court also reconsidered the award for exemplary damages, in light of this court's decision in Ross v. Conoco, Inc., 02-0299 (La.10/15/02), 828 So.2d 546, and concluded that the award was justified. 833 So.2d at 993-995 (on rehearing). On rehearing, Judge Lanier again dissented from the majority's treatment of the issue of exemplary damages, opining that the majority refused to follow this Court's decision in Ross. 833 So.2d at 996-999 (Lanier, J., dissenting on rehearing).
National Union and X.L., ALSA's insurers, filed separate applications for certiorari in this Court. By order dated May 16, 2003, this Court granted both writ applications and consolidated the matters. Bujol v. Entergy Services, Inc., 03-0492, 03-0502 (La.5/16/03), 843 So.2d 1115.

DISCUSSION

Liability for compensatory damages
The mere fact that ALSA is the ultimate parent corporation of ALAC, albeit through four corporate levels of ownership, does not result in the imposition of a duty upon ALSA to provide the employees of ALAC with a safe place to work. The law has long been clear that a corporation is a legal entity distinct from its shareholders and the shareholders of a corporation organized after January 1, 1929 shall not be personally liable for any debt or liability of the corporation. Buckeye Cotton Oil Co. v. Amrhein, 168 La. 139, 121 So. 602 (1929); La. R.S. 12:93(B). The same principle applies where one corporation wholly owns another. See Joiner v. Ryder System Inc., 966 F.Supp. 1478, 1483 (C.D.Ill.1996). While generally a parent corporation, by virtue of its ownership interest, has the right, power, and ability to control its subsidiary, a parent corporation generally has no duty to control the actions of its subsidiary and thus no liability for a failure to control the actions of its subsidiary. See Joiner, supra at 1489-90 *1128 and cases cited therein.[15] The fundamental purpose of the corporate form is to promote capital by enabling investors to make capital contributions to corporations while insulating separate corporate and personal asset from the risks inherent in business. Smith v. Cotton's Fleet Serv., Inc., 500 So.2d 759, 762 (La.1987); Glazer v. Commission on Ethics for Public Employees, 431 So.2d 752, 757 (La.1983). Louisiana courts have declared that the strong policy of Louisiana is to favor the recognition of the corporation's separate existence, so that veil-piercing is an extraordinary remedy, to be granted only rarely. Glenn G. Morris and Wendell H. Holmes, Louisiana Civil Law Treatise, Vol. 8, Business Organizations (1999),  32.02, p. 55 (cites omitted). "If the plaintiffs do not allege shareholder fraud, they bear a `heavy burden' of proving that the shareholders disregarded corporate formalities to the extent that the corporation had become indistinguishable from them." Id. (Cites omitted).
In this case, plaintiffs do not seek to pierce the corporate veil in order to impose liability upon ALSA. Instead, plaintiffs advocate a departure from this established, though extraordinary, exception to limited shareholder liability and assert instead that ALSA breached a duty it voluntarily undertook, that is to provide its subsidiaries with safety requirements based upon its own specialized and highly-developed knowledge about the need for barrier walls around manual oxygen valves, and then failed to enforce these requirements at ALAC. According to the jury interrogatories, the jury found that ALSA "assumed a duty for safety at ALAC's Plaquemine Air Separation Plant." The court of appeal affirmed the jury's determination that ALSA had assumed a duty for safety at the plant by applying the "Good Samaritan Doctrine" found in Section 324A of the Restatement (Second) of Torts to the facts of this case.[16]  324A provides as follows:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [perform] his undertaking, if
(a) his failure to exercise reasonable care increases the risk of harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
This common law doctrine has existed for centuries and has traditionally been used to impose liability upon an actor who has failed to exercise reasonable care when it undertook to perform a duty owed to a third party. See Annette T. Crawley, Environmental Auditing and the "Good Samaritan" Doctrine: Implications for Parent Corporations, 28 G.L.Rev. 223, 234 *1129 (1993) ("Recognition of the Good Samaritan doctrine as an exception to the traditional restriction of liability traces its origin to the seminal eighteenth century case of Coggs v. Bernard," 92 Eng. Rep. 107 (K.B.1703) (citations omitted)). However, in recent years, employees of subsidiary corporations have begun to employ the doctrine to establish the tort liability of a parent corporation as an alternative to piercing the corporate veil.
While this Court has twice cited  324A to hold that, where a duty to protect others against criminal misconduct has been assumed, liability may be created by a negligent breach of that duty, see Mundy v. Department of Health and Human Resources, 620 So.2d 811 (La.1993) and Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984), we have never discussed whether such a cause of action is available in the parent-subsidiary context under Louisiana law, or analyzed the elements required to set forth a cause of action against a parent corporation under  324A.
It is clear that a parent corporation, just like any other person or entity, can be held liable for its own direct acts of negligence. Further, under Louisiana jurisprudence, parties who voluntarily assume certain duties for workplace safety must perform those duties in a reasonable and prudent manner. See, e.g., Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), 700 So.2d 831, writs denied, 97-2921, 97-3000 (La.2/6/98), 709 So.2d 735, 740 (holding that Shell Chemical, a plant premises owner, assumed and violated a duty to protect an employee of one of its independent contractors); Crane v. Exxon Corp., 613 So.2d 214 (La.App. 1 Cir.1992) (holding that Exxon, through its field contract coordinator, assumed a duty of care to an employee of one of its contractors). This Court has decided numerous cases by applying this voluntary assumption of duty doctrine as a basis for the existence of a duty of reasonable care, though it has only cited  324A in two of them, Harris, supra, and Mundy, supra.[17] However, we do not believe it to be contrary to Louisiana law to discuss the principles established in  324A in the parent-subsidiary context for the following reasons: (1) a parent corporation can be held liable just as any other entity or person for its own acts of negligence independent of the parent-subsidiary relationship and can voluntarily assume a duty not otherwise owed; (2) this Court has previously referred to  324A in negligence cases; and (3) courts throughout the country are applying this doctrine in the parent-subsidiary context.
The plain language of the introductory portion of  324A establishes that an assumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. Even if a plaintiff proves the assumption of a duty under that standard and that the defendant failed to exercise reasonable care to perform this undertaking, he can only recover if he further proves that either (a) the defendant's failure to exercise reasonable care increased the risk of such harm; or (b) the defendant has undertaken to perform a duty owed by the employer to the injured employee; or (c) harm is suffered because of reliance of the employer or the injured employee upon the undertaking. Tillman v. Travelers Indemnity *1130 Co., 506 F.2d 917 (5th Cir.1975).[18]
In order to consider whether plaintiffs met the burden of proof set out in  324A, we must first determine whether ALSA "undertook" to render services for ALAC which ALSA should have recognized was necessary for the protection of ALAC's employees, i.e., whether ALSA undertook to provide a safe work place for ALAC's employees. Whether a duty is owed is a question of law. Faucheaux v. Terrebonne Consolidated Government, 92-0930 (La.2/22/93), 615 So.2d 289. The court of appeal cites Schulker v. Roberson, 91-1228 (La.App. 3 Cir. 6/5/96), 676 So.2d 684, 688 for the proposition that whether ALSA assumed a duty to the injured employees at the Plaquemine plant is a factual question to be determined by the fact finder and thus subject to the manifest error rule. 833 So.2d at 959. However, the manifest error rule assumes that the trier of fact applied the correct law in reaching its conclusion. Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise, Vol. 1, Civil Procedure,  14.14, p. 395 (1999). "If the trier of fact applied the incorrect law because of erroneous and prejudicial jury instructions ... and if the appellate court determines the error could have affected the outcome below, the manifest error rule does not apply, and the appellate court makes an independent determination of the facts from the record on appeal." Id., at pp. 395-96; Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). In this case, the jury could not have applied the correct law in determining whether ALSA assumed a duty to the employees at ALAC's plant because it was given no instructions whatsoever on the law of assumption of duty or any of the elements required under  324A.[19] As this *1131 obviously could have affected the outcome, we will review the issue of whether ALSA assumed a duty for safety at ALAC's plant pursuant to  324A under the de novo standard of review.[20]See, e.g., Torrington Co. v. Stutzman, 46 S.W.3d 829 (Tex.12/21/00) (reversing judgment of trial court in favor of plaintiffs against successor corporation and remanding case where broad form negligence charge the trial court submitted to the jury omitted the elements necessary to impose liability upon the successor under a negligent undertaking theory under  324A). Nevertheless, as the rest of this opinion demonstrates, even if we were to review this case under the manifest error standard, our result would be the same.
In determining whether a parent corporation affirmatively undertook the duty of safety owed by its subsidiary, courts have looked to the scope of the parent's involvement, the extent of the parent's authority, and the underlying intent of the parent to determine whether the parent corporation affirmatively undertook the duty owed by the subsidiary. Annette T. Crawley, Environmental Auditing and the "Good Samaritan" Doctrine: Implications for Parent Corporations, 28 Ga. L.Rev. 223, 243 (1993). In Muniz v. National Can Corp., 737 F.2d 145 (1st Cir.1984), a seminal case on this issue, the parent corporation's involvement with industrial safety at its subsidiary's plant included the issuance of general safety guidelines which the parent intended would be implemented by local management and the provision of assistance with safety matters upon request by a subsidiary's local management. The plaintiff maintained that the parent's involvement in safety matters at the subsidiary corporation imposed an independent duty on the parent to provide a safe working environment for the plaintiff and that the parent breached this duty by failing to correct the faulty industrial safety system at the subsidiary's plant. The court held, as a matter of law, that the parent's actions were not "undertakings" sufficient to impose a duty under  324A:
Because an employer has a non-delegable duty to provide safe working conditions for its employees, we do not lightly assume that a parent corporation has agreed to accept this responsibility. Neither mere concern with nor minimal contact about safety matters creates a duty to ensure a safe working environment for employees of a subsidiary corporation. To establish such a duty, the subsidiary's employee must show some proof of a positive undertaking by the parent corporation.
737 F.2d at 148. Muniz holds that "[a] parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment." *1132 Id. Communication or concern over safety matters is not enough. Id.
In reaching this determination, the Muniz court relied on other cases involving the liability of a parent corporation under  324A for unsafe working conditions at its subsidiary's plant:
An employer has a nondelegable duty to provide for the safety of its employees in the work environment. See Love v. Flour Mills of America, 647 F.2d 1058, 1063 (10th Cir.1981). The parent-shareholder is not responsible for the working conditions of its subsidiary's employees merely on the basis of parent-subsidiary relationship.[21]Id; see also Heinrich v. Goodyear Tire & Rubber Co., 532 F.Supp. 1348, 1354-56 (D.Md.1982); Rick v. RLC Corp., 535 F.Supp. 39, 42-43 (E.D.Mich.1981). A parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary. Love, [supra]; see also Treece & Zuckerman, A Parent Corporation's Liability for the Torts of its Subsidiary in the Context of Exclusive Remedy Provision of the Workers' Compensation Laws, 50 Ins. Counsel J. 609, 613-15 (1983).
Such an undertaking may be express, as by contract between the parent and the subsidiary, or it may be implicit in the conduct of the parent.
Id.[22]
Under the Muniz standard, other courts have held that it is not proof of an affirmative "undertaking" to show merely that a parent: (1) hired the safety director to work for the subsidiary;[23] (2) assisted a subsidiary in "evaluating and inspecting the safety conditions" at the subsidiary's plant;[24] or (3) conducted a negligent inspection.[25]
*1133 In this case, there is no question that ALAC, as plaintiffs' employer, was under a statutory duty to provide its employees with a reasonably safe place to work.[26] Further, as a matter of general corporate law, ALSA had no duty as a parent corporation to control the activities of any of its subsidiaries, to insure that its subsidiaries were complying with their duty to provide a reasonably safe place to work, nor any independent duty to notify its subsidiaries of any safety recommendations.[27] Because of these well-established legal rules by which employers and corporations are governed, we will not "lightly assume" that a parent corporation has agreed to accept the subsidiary-employer's duty to provide a safe workplace absent proof of an affirmative undertaking of that duty by the parent corporation. As the above cited cases hold, neither a parent's concern with safety conditions and its general communications with the subsidiary regarding safety matters, nor its superior knowledge and expertise regarding safety issues, will create in the parent corporation a duty to guarantee a safe working environment for its subsidiary's employees under  324A.
In this case, the evidence presented did not establish that ALSA affirmatively undertook to provide ALAC's employees with a reasonably safe place to work under  324A, with regard to the entire plant or with regard to providing barrier walls around oxygen valves. The only evidence presented at this trial that ALSA undertook to issue safety requirements concerning barrier walls to its subsidiaries was the one sentence relied on by the court of appeal from the English translation of TI 84, i.e., that "IT 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks." However, not a single witness *1134 testified that the provisions of TI 84 were, in fact, mandatory guidelines that ALSA subsidiaries had to follow. To the contrary, every single witness with knowledge of the document, including the person who drafted the document, testified that the provisions of TI 84 were merely safety recommendations and that each subsidiary could chose to follow or not, depending on many factors relevant to each plant. The witnesses explained why it would be impossible to impose the same safety factors upon each of its more than 100 subsidiaries in over 60 countries, based on the different local rules and practices, types of equipment used, varying statutory requirements, and numerous other factors. Likewise, the court of appeal's reasoning would mean that by virtue of issuing TI 84, ALSA undertook the duty of safety owed by each of its subsidiaries at hundreds of plants in over 60 countries.
Secondly, the evidence was uncontroverted that when ALSA sent TI 84 to its subsidiaries in 1984, the Plaquemine plant was owned by Big Three and therefore ALSA did not send TI 84 to Big Three as it was not then an ALSA subsidiary. There was no evidence that ALSA ever distributed TI 84 to ALAC when it began ownership and operation of the plant, or at any time. In spite of this, the court of appeal held ALSA liable for undertaking to impose safety requirements upon ALAC but then failing to do so, i.e. "affirmatively undertaking to provide safety requirements" that it never provided to ALAC. A failure to impose safety recommendations that it never even sent to a subsidiary can hardly be characterized as an "affirmative undertaking." Further, the fact that ALSA sent TI 84 to other subsidiaries and not ALAC does not establish an affirmative duty to send it to all its subsidiaries as parent corporations do not have a duty to treat all subsidiaries equally. The witnesses testified that when ALSA purchased Big Three, an American company, they chose to rely on Big Three's expertise in safety matters and did not intercede in any way into Big Three's duty to provide a safe workplace for its employees. Big Three had an excellent safety record, was complying with CGA standards, and was a leader in the United States in this industry. Thus, plaintiffs did not prove that by sending TI 84 to its subsidiaries, it affirmatively undertook to send TI 84 to ALAC, such that its failure to do so breached its assumed duty to provide a safe working environment at the ALAC plant.
Further, the language of TI 84 does not require the use of barrier walls around the valves involved, even if the issuance of TI 84 could be considered an affirmative "undertaking" to provide mandatory safety requirements. TI 84 explains that, while ASLA "called for the use of a sophisticated system of walls forming protective walls and screens" following a series of accidents in the 1960s and 70s, "today, less stringent solutions are possible" because of experience acquired since that time, installation procedures ensuring high quality clean installations and analysis of the accidents since 1970 when the protective wall system was introduced. This clearly indicates solutions other than protective walls and screens were then considered safe and acceptable. The next sentence of TI 84 provides that "for new installations which are up to standard, the only requirement is that operating personnel should be protected during manual opening or closing of gate valves ..." under certain circumstances by a protective wall between the gate valve and the handwheel. As seen by the evidence presented, the valve where the flash fire occurred was an automatic valve, which was ordinarily operated through the use of remote control and which was not normally worked on while *1135 under pressure. While there was no barrier wall between the manual valve that Bujol and Perkins first attempted to close and the handwheel that they turned two times in an attempt to close it, the manual valve is not the valve that exploded and caused their injuries. TI 84 did not even suggest that a wall be placed around automatic valves. The witnesses testified about the drawbacks that would entail if a wall were placed around an automatic valve, i.e., the automatic valve could not be viewed from the control room where it was operated remotely.[28] Further, because by definition an automatic valve is not opened or closed manually, a wall would have prevented the workers from determining what was wrong with the automatic valve and they would have had to go around the wall in order to do so had one been there. TI 84 did provide however that "[t]he question of regular maintenance checks carried out with the pipeline still pressurized must be examined and strict procedural guidelines laid down." Accordingly, it was ALAC, not ALSA, that had safety procedures in place in order for work to be performed on an automatic valve under pressure. Finally, the provisions of TI84 recognized that local rules in force, in this case the CGA which did not require barrier walls, might conflict with the provisions of TI84 (requiring barrier walls) and that in such case, "the Direction Technique may be consulted to decide on the attitude to adopt." (Emphasis added.) This reaffirms the witnesses' testimony that the provisions of TI84 regarding barrier walls were not mandates, but merely recommendations that may or not be applicable depending on the circumstances of each plant, and that ALSA was available to offer advice if requested by a subsidiary.
However, even if TI 84 were considered an undertaking on the part of ALSA to provide ALAC's employees with a safe place to work, plaintiffs still cannot prevail in this case. For even proof of an affirmative undertaking to assume a duty of safety owed by the subsidiary is not enough to impose liability on a parent for its breach, as liability can only be imposed under  324A if one of the requirements of  324A(a)-(c) are also met.
Under  324A(a), a plaintiff must prove that the parent's breach of its assumed duty resulted in an increased risk of harm. This section requires "some change in conditions that increases the risk of harm to the plaintiff over the level of risk that existed before the defendant became involved." Canipe v. Nat'l Loss Control Serv., 736 F.2d 1055, 1062 (5th Cir.1984). The comments to  324A(a) reveal that "increased risk" means "some physical change to the environment or some other material alteration of circumstances." Patentas v. U.S., 687 F.2d 707, 717 (3rd Cir.1982). ALSA's failure to send TI 84 to ALAC and subsequent failure to compel ALAC to erect barrier walls did not increase the risk of harm to plaintiffs as required by  324A(a), as the lack of barrier walls existed many years before ALSA ever became involved with ALAC, and there was no "physical change to the environment or some other material alteration of circumstances" resulting from the lack of barrier walls.[29]
*1136 Under  324A(b), a plaintiff must show that the parent undertook to perform a duty owed by the subsidiary to the plaintiff. This is a more stringent requirement than the "positive undertaking" requirement of the introductory paragraph. The majority of cases that have held that a parent, or other entity, will only be liable for a voluntary assumption of duty under  324A(b) where that corporation's undertaking was intended to supplant, not just supplement, the subsidiary's duty. See e.g., Heinrich, supra ("Liability under section 324A(b) arises in the workplace setting only if the actor's undertaking was intended to be in lieu of, rather than as a supplement to, the employer's own duty of care to the employee") (citing Davis, supra; Stacy v. Aetna Casualty & Surety Co., 484 F.2d 289, 294 (5th Cir.1973); Blessing v. U.S., 447 F.Supp. 1160, 1193-95 (E.D.Pa.1978)); cf. Boggs v. Blue Diamond Coal Co., 590 F.2d 655, 663 (6th Cir.), cert. denied, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979) (parent liable in tort because it had negligently undertaken to design and install a ventilation system at subsidiary's mine that caused the death of fifteen miners because the parent had the primary responsibility for the safety program in the mine); In re Norwest Bank Fire Cases, 410 N.W.2d 875 (Minn. Ct.App.1987).[30] This requirement is especially compelling in the parent-subsidiary context where the subsidiary is an employer required by law to provide its employees with a reasonably safe workplace. In this case, there was no evidence presented that would indicate that ALSA intended to supplant ALAC's duty to provide its employees with a reasonably safe place to work, with regard to the entire plant or the specific valves and pipelines at issue. To the contrary, ALAC retained the final responsibility for fulfilling its duty of safety in that it had its own safety management in place and its own safety rules, ALSA exercised no authority to compel ALAC to comply with the guidelines of TI 84 and never sought to do so, leaving it up to each subsidiary to manage its own plant. In addition, ALSA never audited nor inspected the ALAC plant or the valve that exploded in this case and never even made any safety recommendations specific to this plant at all.
Finally,  324A(c) requires that the harm was suffered because of reliance by the plaintiff or the subsidiary on the parent's undertaking to provide for safety at the subsidiary's plant. See Johnson v. Abbe Engineering Co., 749 F.2d 1131, 1133 (5th Cir.1984) (subsidiary's plant manager testified that he relied on parent for accident prevention and safety training, thus meeting the requirements of  324A(c)); see also Gaines v. Excel Industries, Inc., 667 F.Supp. 569 (M.D.Tenn. 1987) (summary judgment reversed for failure to rebut assertions of reliance on parent's safety inspections). Plaintiffs cannot prevail under  324A(c) as no evidence was presented to prove reliance by ALAC or plaintiffs on ALSA's alleged undertaking. In fact, the evidence presented proved just the opposite, that ALSA relied solely on Big Three and subsequently ALAC to provide for safety at its own *1137 plant. ALAC certainly did not rely on ALSA's guidelines, nor did they rely on ALSA, based on ALSA's expertise and experience in the industry, to provide them with any safety advice relative to the safety of the valves at issue or any other aspect of plant safety.[31]
After careful review of the record, we find that the evidence presented does not establish, under the  324A of the Restatement (Second) of Torts, that ALSA affirmatively undertook to provide ALAC's employees with a reasonably safe place to work, with regard to either the entire plant or the valves and pipelines at issue, and that either (a) ALSA's failure to exercise reasonable care increased the risk of harm; or (b) ALSA's undertaking was intended to supplant ALAC's duty to provide its employees with a reasonably safe place to work; or (c) the accident occurred because of reliance by ALAC or the injured employees upon the undertaking. Accordingly, we reverse the jury's award of compensatory damages in favor of plaintiffs.

Liability for Punitive Damages
The trial court awarded punitive damages under former article 2315.3 of the Louisiana Civil Code, and the court of appeal affirmed that award.[32] Former article 2315.3 provided, in pertinent part:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage handling, or transportation of hazardous or toxic substances. (Emphasis added).
When a statute authorizes the imposition of punitive damages, the statute is subject to strict construction. Ross v. Conoco, supra at 556 (citing International Harvester Credit v. Seale, 518 So.2d 1039, 1041 (La.1988)). For this reason, this Court has held that damages under former La. C.C. art. 2315.3 are recoverable on a derivative basis where a plaintiff is entitled to recover tort damages. Corbello v. Iowa Production, 02-0826 (La.2/25/03), 850 So.2d 686, 707; Adams v. J.E. Merit Construction, Inc., supra (employee not entitled to recover punitive damages from his employer under 2315.3 because the first phrase of 2315.3 providing that "in addition to general and special damages, punitive damages may be awarded ...," *1138 implies that punitive damages are only available to those persons who are eligible to recover general damages and special damages).
Because the plaintiffs in this care are not entitled to general and special damages from ALSA, as we have ruled today that ALSA is not liable to plaintiffs under  324A of the Restatement (Second) of Torts, plaintiffs are not entitled to punitive damages under former La. C.C. art. 2315.3.

CONCLUSION
Under Louisiana law, the duty to provide workplace safety rests by statute with the employer, ALAC. The evidence presented does not establish that ALSA affirmatively assumed ALAC's duty to provide a safe workplace under  324A of the Restatement (Second) of Torts. Finally, because plaintiffs are not entitled to general or special damages against ALSA, the award of punitive damages under former La. C.C. art. 2315.3 cannot stand.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed, and plaintiffs' cases are dismissed with prejudice at their costs.
REVERSED; CASES DISMISSED.
JOHNSON, J., dissents and assigns reasons.
JOHNSON, J. dissenting.
I dissent from the majority's conclusion that the jury's verdict was manifestly erroneous. The evidence at trial showed that Air Liquid, S.A. ("ALSA") is the corporate ancestor of Air Liquide America Corporation ("ALAC") via a "cascading ownership" scheme. ALSA owns the majority shares of Air Liquide International, S.A., which owns the majority shares of American Air Liquide, Inc., which owns the majority shares of AL American Holdings, which owns the shares of ALAC.
Plaintiffs do not argue that ALSA, as a parent corporation, is automatically accountable for ALAC's liabilities. Rather, plaintiffs contend that ALSA is liable in its own right because it assumed the duty to control the transportation and handling of oxygen at the Plaquemine facility and breached that duty.
If a person undertakes a task which he otherwise has no duty to perform, he must nevertheless perform that task in a reasonable and prudent manner. Harris v. Pizza Hut, 455 So.2d 1364 (La.1984); McGowan v. Victory and Power Ministries, 99-0235 (La.App. 1 Cir. 3/31/00), 757 So.2d 912. A negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability. McGowan, supra. The RESTATEMENT (SECOND) OF TORTS  324A (1966)[1] provides:

*1139 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Whether a duty is assumed is a factual question to be determined by the fact finder. Schulker v. Roberson, 91-1228 (La. App. 3 Cir. 6/5/96), 676 So.2d 684. A trial court's findings of fact may not be reversed absent manifest error or unless clearly wrong. Stobart v. State of Louisiana, through Dep't of Transp. and Dev., 92-1328 (La.4/12/93), 617 So.2d 880. This court has a constitutional duty to review facts. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. Because we have this duty, we must determine whether the verdict was clearly wrong based on the evidence, or clearly without evidentiary support. Id. The reviewing court must do more than just simply review the record for some evidence which supports or controverts the trial court's findings; it must instead review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. The reviewing court must always keep in mind that "if the trial court's or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 882-83 (citing Housley v. Cerise, 579 So.2d 973 (La.1991)) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
To support their contention that ALSA was liable for the safety of ALAC's employees because ALSA assumed the duty, plaintiffs relied upon Miller v. Bristol-Myers Company, 168 Wis.2d 863, 485 N.W.2d 31 (1992). In that case, the plaintiff was injured in a flash fire while working for the subsidiary. The plaintiff sued the parent corporation, Bristol-Myers Corporation, which was the sole stockholder of the subsidiary, Medical Engineering Corporation, alleging that the parent corporation assumed a duty to the subsidiary's employees. The evidence revealed that the parent corporation managed and *1140 monitored the subsidiary's performance through the subsidiary's board of directors. The Wisconsin Supreme Court concluded that the parent company had, as a matter of law, assumed a duty of the subsidiary for the safety of its employees. That Court stated:
The introductory portion [of section 324A] establishes when an assumption of duty arises. The elements for an assumption of duty to arise are that the actor must: (1) undertake to render services, (2) to another, (3) which such actor should recognize as necessary for the protection of a third person.
Miller, 168 Wis.2d at 883, 485 N.W.2d at 38.
In this case, plaintiffs introduced into evidence a document known as "Technical Instruction 84" ("TI 84"), which was the technical instruction utilized by ALSA and its related entities, and was implemented to protect against various hazards presented by oxygen. It is important to note that TI 84 was implemented following a series of similar explosions and fatalities at ALSA facilities in Europe. TI 84 acknowledges that the Compressed Gas Association, Inc. ("CGA") "may also lay down guidelines ..." in the United States and Canada.[2] TI 84 contains the following statements:
In early 1983 in Europe, the [Industrial Gas Committee ("IGC")][3] brought out a document 13/82 entitled THE TRANSPORTATION AND DISTRIBUTION OF OXYGEN BY PIPELINE. It is fairly complete and matches the rules to be respected throughout our Group.
* * *
TI 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks.
TI 84 also acknowledges that after the European explosions, ALSA adopted an industry standard that required the erection of protective walls and screens in compressed gas facilities. Under this new standard, when a plant worker was required to operate a valve which is in operation, he must be protected by a barrier wall or screen.
It is undisputed that there were no protective walls or screens surrounding the pressurized valves at the Plaquemine plant. It is also clear that such barrier walls are utilized routinely in ALSA's European subsidiaries. Following the accident, ALAC enlisted a team of investigators to delve into the matter and determine the cause of the flash fire. After determining the probable cause of the fire, the investigators made certain recommendations, which were later promulgated as rules by CGA, including the following:
7.1.0 [CGA] pamphlet number G-4.4, revision 1993, INDUSTRIAL PRACTICES FOR GASEOUS OXYGEN TRANSMISSION AND DISTRIBUTION PIPING SYSTEMS, should be considered the minimum acceptable *1141 standard document when designing an oxygen piping system (fn.omitted).
* * *
7.11.0 Barrier walls must be utilized around all oxygen control valve stations in high velocity pressure reducing service. Such walls are to be designed and constructed to withstand the expected forces involved in any oxygen pipeline fire and resulting rupture.
* * *
7.13.0 Manual isolation valves, isolating pressure regulating control valves, are to be within the barrier wall. Their operating hand wheels must project and be accessible outside the barrier wall.
Louis Butherol, a longtime ALSA employee, now retired, was designated to testify at the trial as the corporate representative for ALSA. At trial Butherol testified that contrary to the language of the TI 84, barrier walls were never "required;" they were merely "recommended." Butherol testified that the phrase "minimum requirements" was an incorrect translation of the French phrase "regle minimal," which means "minimum rule" or "guide." Butherol declined to render an opinion of whether barrier walls should have been installed at the Plaquemine plant because he was unfamiliar with the facility, as he had never visited the plant. Butherol further admitted that protective walls or screens were used for oxygen let-down stations in the European plants but were never utilized in the United States.
Claude Tronchon, formerly the CEO of ALAC, testified that he is the General Manager of Risk Management. Tronchon admitted that when he was CEO of ALAC, all of the Canadian and American subsidiaries reported to him. He acknowledged that he was aware that ALAC and Big Three were not following the same technical safety guidelines as the European counterparts. He was equally aware that Big Three was not following ALSA's technical recommendations with respect to safety and design, but "we didn't feel that it was necessary to do anything about that" due to Big Three's good safety record. Tronchon testified that when he visited the Plaquemine plant, he met with Hracek, but he did not discuss any technical changes that should be implemented. Tronchon conceded that ALSA's safety policy states that the absence of accidents does not necessarily mean that a good safety situation exists, and that ALSA could impose any particular safety or technical standard upon ALAC or Big Three if it had chosen to do so.
Gerard Campion, the Safety Director for the Air Liquide world group, testified that after a plant explosion at one of its plants in Mons, Belgium in 1968, in which a plant manager was killed at a manual valve station, ALSA saw to it that barrier walls were built around its let-down stations at its subsidiaries. Campion testified that it was the responsibility of ALSA's Direction Technique to insure that the TI 84 was distributed to the subsidiaries in the United States. He also admitted that he was responsible for making sure that ALSA's safety policy was applied.
Additionally, Eric Fortuit, who was the Director of the Direction Technique at the time of the accident at issue, described the function of the Direction Technique as follows:
We write recommendations, and effectively for us it is important to know whether the recommendations are understood. Therefore, we make visits to the subsidiaries, we also help the subsidiaries to make the audits of their ... plant, because in the entire function they are responsible to make the audit of their ... own plant.

*1142 After the Plaquemine plant accident, ALSA made a "[Recommendation of Technical Safety] for all the subsidiaries, to remind them of the former technical instructions concerning the [barrier] walls...."
Fortuit testified that prior to plaintiffs' accident, he had never visited the Plaquemine plant, so he was unaware of the condition of the letdown station there. Fortuit admitted that he did not know that Big Three was not using protective walls and screens, although he knew that all of the ALSA plants in France have them. Moreover, Fortuit admitted that the safety standards set forth in TI 84 are the minimum safety standards for ALSA and that the AL Group instructs the subsidiaries and makes written recommendations to them regarding safety measures. Like Butherol, Fortuit testified that the guidelines set forth in TI 84 were merely recommendations, not requirements.
Defendants contended that ALSA did not "undertake to perform a duty owed" by ALAC. According to defendants, ALSA was not obligated to enforce TI 84 because TI 84 is not a "mandate." Defendants maintained that each subsidiary, outside of France, was responsible for its own safety regulations. Butherol testified that the procedures outlined in the TI 84 are not requirements, and Campion testified that ALSA issues periodic safety recommendations to its subsidiaries, but the implementation of those recommendations are at the discretion of the manager of each subsidiary.
Moreover, defendants maintained that even if TI 84 may be construed as an order, a parent corporation is not liable for workplace injuries under section 324A of the RESTATEMENT (SECOND) OF TORTS. In Muniz v. National Can Corp., 737 F.2d 145 (1st Cir.1984), the subsidiary's employee sued the parent corporation, seeking damages for injuries he sustained allegedly as the result of exposure to toxic lead fumes while employed by the subsidiary. The plaintiff alleged that the parent corporation was liable for his work-related injuries because it was "involved" with safety measures at the subsidiary. The sole issue before the court was whether the parent corporation had assumed responsibility for the safe working conditions at the subsidiary. The district court ruled in favor of the parent corporation, finding that the "duty and control [of safety matters] were primarily in the hands of the subsidiary's local management, [and] ... [the parent corporation] had no independent duty" to provide safe working conditions at the subsidiary plant. Muniz v. National Can Corp., No. 81-0435(TR), slip. Op. at 4 (D.P.R. July 14, 1983).
The court of appeal, citing Love v. Flour Mills of America, 647 F.2d 1058 (10th Cir.1981), noted that a parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment at the subsidiary. Such an undertaking may be express, as by contract between the parent and the subsidiary, or it may be implicit in the conduct of the parent. Muniz, 737 F.2d at 148. After reviewing the evidence presented, the Muniz court concluded:
There is no evidence in this case that [the parent corporation] assumed responsibility for safety at [the subsidiary plant]. Nor does the evidence show that [the subsidiary] relied on [the parent corporation] for this purpose by lessening or omitting its own safety measures. (Citations omitted). Rather, the evidence shows that [the parent corporation] provided general safety guidelines, not specifically directed to the concentration of lead in the workplace (fn.omitted), and that [the parent corporation] *1143 intended for these general guidelines to be implemented by local management (fn.omitted.)
Muniz, 737 F.2d at 149.
Liability under 324A(b) of the RESTATEMENT (SECOND) OF TORTS arises in the workplace setting only if the actor's undertaking was intended to be in lieu of, rather than as a supplement to, the employer's own duty of care to the employees. Davis v. Liberty Mutual Ins. Co., 525 F.2d 1204 (5th Cir.1976); Stacy v. Aetna Casualty & Surety Co., 484 F.2d 289 (5th Cir.1973); Blessing v. United States, 447 F.Supp. 1160 (E.D.Pa.1978). In Boggs v. Blue Diamond Coal Co., 590 F.2d 655 (6th Cir.), cert. denied, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979), fifteen coal miners were killed when methane gas exploded in a mine in Kentucky. The miners were employed by a subsidiary corporation owned by the defendant, the parent corporation. The parent corporation operated several coal mines and related businesses, and described itself as a "multiunit enterprise consisting of a group of wholly owned subsidiary corporations controlled by a central holding company...." Boggs, 590 F.2d at 657. The wives of the men filed a wrongful death action against the parent corporation, alleging that it provided management, engineering and safety services to the subsidiary, including advice and assistance in mine ventilation. The management of the parent corporation recognized that improvements were needed in order to minimize the accumulation of methane gas, but it delayed construction of the improvements. The court of appeal affirmed the district court's denial of the parent corporation's motion for summary judgment, finding that the management structure was such that the parent had the "primary" responsibility for the safety program in the mine operated by the subsidiary.
Similarly, in Oliver v. St. Clair Metal Products Co., 45 Mich.App. 242, 206 N.W.2d 444 (1973), an injured employee sued the parent of his employer as a third party, claiming that negligence by the employees of the parent had caused his workrelated injury. Each of the parent corporation's plants were separately incorporated as subsidiaries. The court held that the suit could be maintained, as the evidence showed that a management official of the parent corporation, who was in charge of supervising production at various plants, had become aware of the lack of safety features on a machine operated by the plaintiff.
In the instant case, the jury was presented with ALSA's own document, the TI 84, which clearly provides that it "sets the minimum requirements to be met throughout the AL Group ...," which encompasses facilities throughout the United States, including the one in Plaquemine. The TI 84 went on to state that the ICG document entitled THE TRANSPORTATION AND DISTRIBUTION OF OXYGEN BY PIPELINE, the European counterpart to CGA pamphlet entitled INDUSTRIAL PRACTICES FOR GASEOUS OXYGEN TRANSMISSION AND DISTRIBUTION PIPING SYSTEMS, "is fairly complete and matches the rules to be respected throughout our Group." (Emphasis added). The TI 84 further stated, "In the event of incompatibility with rules in force locally, the DIRECTION TECHNIQUE may be consulted to decide on the attitude to adopt."
After considering the testimony and the documentary evidence, the jury concluded that ALSA had assumed a duty for safety at the plant. After reviewing the record in its entirety, I am convinced that the jury was correct in its determination that ALSA assumed the duty for safety at the Plaquemine facility and that ALSA's negligence was a legal cause of plaintiff's injuries. *1144 The jury was presented with two permissible views of the evidence of whether the procedures set forth in the documents were mandates or mere guidelines or recommendations. The TI 84 clearly described the instructions contained therein as "minimum requirements." Apparently, the jury convinced that ALSA, as the parent corporation, had set forth minimum requirements for safety at its various subsidiaries around the world, not just in Europe.
For the foregoing reasons, I respectfully dissent.

ON REHEARING
PER CURIAM.[*]
We granted plaintiffs' application for rehearing in this case because at least some of the justices in the original majority were concerned about the propriety of the majority's decision in the original opinion to review the jury verdict in favor of the plaintiffs under a de novo standard, as opposed to a manifest error standard of review.[1] The majority's decision to apply the de novo standard was based on its conclusion that "the jury could not have applied the correct law in determining whether ALSA assumed a duty to the employees at ALAC's plant because it was given no instructions whatsoever on the law of assumption of duty or any of the elements required under [Restatement (Second) of Torts]  324A. Bujol v. Entergy Services, Inc., XXXX-XXXX (La.5/25/04), at 1130. In their application for rehearing, the plaintiffs challenged the majority's decision to apply the de novo standard of review and give no deference to the jury verdict, arguing that defendants waived their right to complain about the jury instruction when they failed to object to the overall instruction at trial. As plaintiffs correctly point out, La.Code of Civil Proc. art. 1793(C) provides that "[a] party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict, or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection."
Following a careful review of our original decision in this case, in light of the plaintiffs' arguments made in their application for rehearing, and the defendant's contrary contentions, we reinstate our original decision. Although the court did apply a de novo standard of review, we also specifically noted that "even if we were to review this case under the manifest error standard, our result would be the same." Id. At this juncture, after grant of rehearing and presentation of oral arguments anew, we find no need to decide whether de novo is the appropriate standard of review (that is, giving no deference to the jury's finding), for we resolve this case upon finding correct our alternate conclusion on original hearing that, under the manifest error standard, the jury's verdict cannot stand and must be reversed.
La.Rev.Stat. 23:13 imposes on employers a duty to "furnish employment which shall be reasonably safe for the employees *1145 therein." That duty is not automatically imposed on parent companies of employers. Generally, "[a] parent corporation may be liable for unsafe conditions at a subsidiary only if it assumes a duty to act by affirmatively undertaking to provide a safe working environment." Muniz v. National Can Corp., 737 F.2d 145, 148 (1st Cir.1984). Communication or concern over safety matters is not enough. Id. In this case, the lower courts applied the provisions of Restatement [Second] of Torts  324A[2] to find that ALSA assumed a duty to act by undertaking to provide a safe working environment at the plant of its subsidiary, ALAC.
As we stated in our original decision, under the plain language of the introductory portion of  324A, an assumption of duty arises only when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. Moreover, even if a plaintiff proves the assumption of a duty under that standard and that the defendant failed to exercise reasonable care to perform that duty, he may only recover if he further proves that either (a) the defendant's failure to exercise reasonable care increased the risk of such harm; or (b) the defendant has undertaken to perform a duty owed by the employer to the injured employee; or (c) harm is suffered because of reliance of the employer or the injured employee upon the undertaking. Id. at 1129, citing Tillman v. Travelers Indemnity Co., 506 F.2d 917 (5th Cir.1975).
Our decision on this rehearing, that we correctly found in the original opinion that the jury's verdict was manifestly erroneous, is based primarily on the fact that the record in this case is devoid of evidence from which the jury could reasonably have concluded that ASLA "affirmatively undertook" to provide a safe working environment at ALAC. At trial, the only evidence presented by the plaintiffs to support their theory that ALSA affirmatively assumed a duty of safety for ALAC's employees was the introduction of ALSA's Technical Instruction 84 ("TI 84"), a document that addressed barrier walls, among other things and that was disseminated to all of ALSA's subsidiaries in 1984. Plaintiffs point to the following excerpt from TI 84, found in a section of the document titled "Protective walls and screens," as evidence that ASLA acted to require barrier walls around the valve that exploded causing their injuries in this case.
For new installations which are up to standard, the only requirement is that operating personnel should be protected during manual opening or closing of gate valves when:
P D2 > 3 000
where:
P = effective pressure in bars
D = nominal diameter in cm.
In this case, provision must be made for a protective wall between the gate valve and the handwheel.

Plaintiffs also point to language in the English translation of TI 84, which was *1146 originally written in French, which stated that "TI 84 sets the minimum requirements to be met throughout the AL Group as regards oxygen pipeline networks," as well as another statement the rules set forth therein "must be followed" for all ALSA pipelines. Through its preparation and dissemination of TI 84 to its subsidiaries in 1984, plaintiffs argue that ALSA met all the requirements for liability under  324A because it (1) undertook to render services, (2) to another, (3) which it should have recognized as necessary for the protection of a third person.
On the other hand, ALSA presented the testimony of numerous employee witnesses with direct knowledge about the preparation and dissemination of TI 84 in 1984, including the person who drafted the document, each of whom testified that the provisions of TI 84 were never intended to set any type of minimum standards, as the English translation of the document indicates, but were merely safety recommendations. According to the testimony of ALSA's witnesses, which is summarized in some detail in our original opinion, each ALSA subsidiary could chose to follow TI 84 or not, depending on many factors relevant to each plant. As we stated on original hearing:
The witnesses explained why it would be impossible to impose the same safety factors upon each of its more than 100 subsidiaries in over 60 countries, based on the different local rules and practices, types of equipment used, varying statutory requirements, and numerous other factors. Likewise, it would be a ludicrous to hold that by issuing TI 84, ALSA undertook the duty of safety owed by each of its subsidiaries at hundreds of plants in over 60 countries.
Id. at 1133-34.
Based on the testimony summarized above, ALSA asserts that it did not meet any of the requirements for liability under  324A because, despite its preparation and dissemination of TI 84 to its European subsidiaries in 1984, it never (1) undertook to render services, (2) to another, (3) which it should have recognized as necessary for the protection of a third person. We agree. Our review of the record reveals no evidence from which the jury could reasonably have found that ALSA "assume[d] a duty to act by affirmatively undertaking to provide a safe working environment." Muniz, 737 F.2d at 148. The most that could be said is that in 1984, through its preparation and dissemination of TI 84 in 1984, ALSA communicated concern over safety matters at its subsidiaries to which the document was disseminated. That being the case, we find that the plaintiffs failed to prove, under the legal principles applicable to this case, that ASLA "assumed a duty to act by affirmatively undertaking to provide a safe working environment" at ALAC's plant when it disseminated the document to its 1984 subsidiaries.
Further, the record evidence is uncontradicted that ALAC was never provided with TI 84, as it was purchased by ALSA in 1986, two years after 1984 when TI 84 was disseminated to ASLA's subsidiaries. The reason TI 84 was never disseminated to ALAC was clear in the record in this case. Defense witnesses testified that when ALSA purchased Big Three, an American company which owned ALAC, they chose to rely on the expertise of Big Three and its subsidiary, ALAC, in safety matters and did not intercede in any way into Big Three's or ALAC's duty to provide a safe workplace for its employees. Big Three had an excellent safety record, was complying with Compressed Gas Association ("CGA") standards, and was a leader in the United States in this industry. *1147 Given the fact that liability under the first paragraph of  324A must be premised on some type of "affirmative undertaking," ALSA's failure to disseminate TI 84 to ALAC cannot be sufficient grounds for proving assumption of the duty of safety or for imposing liability under that paragraph.
In addition to the above reasons supporting our finding that ALSA never "assumed a duty to act by affirmatively undertaking to provide a safe working environment" at ALAC, we note that the language of TI 84 does not require the use of barrier walls around the valves involved in this case, even if the issuance of TI 84 could be considered an "affirmative undertaking" and even if the document had been disseminated to ALAC. We explained the record evidence on this issue as follows in our original opinion:
TI 84 explains that, while ASLA "called for the use of a sophisticated system of walls forming protective walls and screens" following a series of accidents in the 1960s and 70s, "today, less stringent solutions are possible" because of experience acquired since that time, installation procedures ensuring high quality clean installations and analysis of the accidents since 1970 when the protective wall system was introduced. This statement indicates solutions other than protective walls and screens were then considered safe and acceptable. The next sentence of TI 84 provides that "for new installations which are up to standard, the only requirement is that operating personnel should be protected during manual opening or closing of gate valves ..." under certain circumstances by a protective wall between the gate valve and the handwheel. As seen by the evidence presented, the valve where the flash fire occurred was an automatic valve, which was ordinarily operated through the use of remote control and which was not normally worked on while under pressure. While there was no barrier wall between the manual valve that Bujol and Perkins first attempted to close and the handwheel that they turned two times in an attempt to close it, the manual valve is not the valve that exploded and caused their injuries. TI 84 did not even suggest that a wall be placed around automatic valves. The witnesses testified about the drawbacks that would entail if a wall were placed around an automatic valve, i.e., the automatic valve could not be viewed from the control room where it was operated remotely. Further, because by definition an automatic valve is not opened or closed manually, a wall would have prevented the workers from determining what was wrong with the automatic valve and they would have had to go around the wall in order to do so had one been there. TI 84 did provide however that "[t]he question of regular maintenance checks carried out with the pipeline still pressurized must be examined and strict procedural guidelines laid down." Accordingly, it was ALAC, not ALSA, that had safety procedures in place in order for work to be performed on an automatic valve under pressure. Finally, the provisions of TI84 recognized that local rules in force, in this case the CGA which did not require barrier walls, might conflict with the provisions of TI84 (requiring barrier walls) and that in such case, "the Direction Technique may be consulted to decide on the attitude to adopt." (Emphasis added.) This reaffirms the witnesses' testimony that the provisions of TI84 regarding barrier walls were not mandates, but merely recommendations that may or not be applicable depending on the circumstances of each plant, and *1148 that ALSA was available to offer advice if requested by a subsidiary.
Bujol, XXXX-XXXX, at 1134-35.
As explained in our original decision, the plaintiffs' evidence was also insufficient to establish liability under  324(A)(b), which, as we stated in our original decision, includes an even more stringent requirement than the "positive undertaking" requirement of the introductory paragraph of  324(A) Id. at 1135. In fact, "a parent, or other entity, will only be liable for a voluntary assumption of duty under  324(A)(b) where that corporation's undertaking was intended to supplant, not just supplement, the subsidiary's duty." Id. at 1136. In short, liability under this section cannot be based on a failure to assume a duty, but is instead created when an entity assumes a duty to act by affirmatively undertaking to provide a safe working environment to the extent that by its actions it has totally supplanted and taken over the subsidiary's duty and then breaches the duty it has affirmatively undertaken. There is absolutely no reasonable factual basis in the record to support such a finding.
In conclusion, the duty to provide workplace safety in this case rests by Louisiana statute with ALAC, the employer. The defendant in this case, ALSA, ALAC's distant parent, can assume ALAC's statutory duty for workplace safety only by "affirmatively undertaking to provide a safe working environment." Plaintiffs' introduction of TI 84 to prove that ALSA "affirmatively undertook" ALAC's duty of safety fails for three reasons. First, the preparation and dissemination of TI 84 to ALAC's subsidiaries in 1984 was more of a communication or concern about workplace safety than the "affirmative undertaking" required to assume a duty of safety. Second, TI 84 was, for good reasons explained above, never even disseminated to ALAC or its direct parent, Big Three, when Big Three was acquired by ALSA years after TI 84 was disseminated in Europe. Third, the language of TI 84 indicates that it was never intended to require barrier walls around automatic valves, like the one that caused the injuries here. Thus, our original decision reversing the jury verdict in favor of the plaintiffs is reaffirmed.
KNOLL, Justice, dissents & assigns reasons.
JOHNSON, Justice, dissents and assigns reasons.
KNOLL, J., dissenting.
This case presented a fact-driven issue resolved by employing a manifest error analysis. In my view, the majority does great violence to the well accepted tenet of this Court that where a rational basis exists for the factfinder's determination, particularly in light of conflicting testimony, manifest error review dictates affirmation of the factfinder's rational assessment of the evidence. Instead, in an effort to shield a parent corporation from liability for having addressed a safety issue, the majority ignores the manifest error doctrine and fails to consider that a rational basis existed for the jury verdict. As a result, the majority rewards a parent corporation for opting not to share critical, lifesaving safety information with one of its subsidiary corporations which should have met the requirements established therein, and signals to other similarly structured corporations that this manner of operation is permissible in Louisiana.
It is well established that the issue of whether a duty is owed is a question of law. Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289 (La. 1993). However, whether Air Liquide assumed a duty to the injured employees at the Plaquemine plant is a factual question *1149 determined by the factfinder and thus subject to the manifest error rule. Schulker v. Roberson, 91-1228 (La.App. 3 Cir. 6/5/96), 676 So.2d 684, 688.
In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving negligence on the part of the defendant by a preponderance of the evidence. Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows that the fact sought to be proved is more probable than not. Benjamin ex rel. Benjamin v. Housing Authority of New Orleans, XXXX-XXXX (La.12/1/04), 893 So.2d 1, 5. Further, in civil cases, the appropriate standard for appellate review of factual determinations is the manifest error ÔÇö clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n, 2002-2660 (La.6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the trial court where the trial court judgment is not clearly wrong or manifestly erroneous. Id. at 9-10, 851 So.2d at 1023. Moreover, a majority of this Court has held the manifest error standard of review not only applies to all factual findings, but also includes sufficiency of the evidence challenges. Hall v. Folger Coffee Co., XXXX-XXXX (La.4/14/04), 874 So.2d 90, 99.
It is eminently clear in the present case that during this two-week jury trial the parties presented conflicting evidence on the pivotal issue in this case, i.e., whether Air Liquide assumed a duty to provide its subsidiary, the Plaquemine plant, with safety requirements it had acquired from its experiences in Europe, and the evidence was more than sufficient to establish the existence of a duty and Air Liquide's assumption of that duty. In such circumstances, one of the basic tenets of the manifest error standard of review is that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review." Parish Nat. Bank v. Ott, XXXX-XXXX (La.2/25/03), 841 So.2d 749, 753. This principle is further explained in Ott as follows:
Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court is convinced that had it been the trier of fact, it would have weighed the evidence differently. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). The trier of fact is in a better position to evaluate the credibility of witnesses and make factual determinations than is a reviewing court. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
. . .
`This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting *1150 as trier of fact, it would have weighed the evidence differently.'
Id. at 753-54, quoting Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
In the present case, the jury, after hearing conflicting testimony on many of the key elements of this case, found Air Liquide "assumed a duty for safety at [Air Liquide America's] Plaquemine Air Separation Plant," and further found Air Liquide breached that duty. To the contrary, the majority now rejects two weeks of trial evidence and summarily adopts carte blanche Air Liquide's argument that TI-84 was not mandatory and was inapplicable to automatic valves. My careful, studied review of this record makes it abundantly clear a reasonable factual basis exists for the jury's findings and these findings are not manifestly erroneous.
TI-84's existence was rooted in Air Liquide's European experiences, involving horrific flash fires like the one at the Plaquemine plant. As a result of its European investigation, showing barrier walls in let-down stations at oxygen generating plants were essential for the protection of the workers, Air Liquide promulgated TI-84 as a set of minimum requirements to be released to all its subsidiaries and its rule was to be respected throughout its group of companies.
I find the jury fully considered Air Liquide's post-accident characterization of TI-84 as a discretionary, informational communication, and reasonably rejected that in favor of the mandatory nature of the promulgation as fully explained in Air Liquide's own translation. The jury knew the importance of TI-84 and that Air Liquide's English translation went unchallenged for over a decade. As the judge instructed, the jury had to make a credibility determination on this factual issue and was well aware of its duty to assess whether Air Liquide's witnesses' testimonies were simply self-serving. In our system of justice, these questions classically fall within the purview of the jury and are subject to manifest error review. Unlike the majority's new characterization of this seminal document as "a communication or concern about workplace safety," Op. at 1148, the jury heard conflicting testimony on this issue and chose not to accept Air Liquide's self-serving testimony. Despite Air Liquide's contrary, self-serving assertion at trial about whether the French edition of this requirement was discretionary, its contemporaneous English translation left no doubt its subsidiaries lacked discretion in the implementation of TI-84. Therefore, I find the jury reasonably interpreted TI-84 against Air Liquide because it was Air Liquide who provided the English translation and never asserted a different interpretation prior to this accident.
I further disagree with the majority's finding that the requirements of TI-84 were inapplicable to automatic valves at let-down stations. First, the majority's adoption of Air Liquide's contention artificially separates the valves contrary to the evidence. Although it cannot be gainsaid that the automatic and manual valves are spatially separated, the distance of separation is small as Bujol and Perkins said they could see the automatic valve suddenly close as they stood nearby at the manual valve. Secondly, the evidence clearly shows that the manual valve functioned as a means to depressurize the line so that the automatic valve could be isolated and safely inspected. Thus, there is a functional connection between the automatic and manual valves. Moreover, as Chester Grelecki, the plaintiffs' expert, testified, not only would the barrier wall have served as a screen for the workers as they manipulated the manual valve safely behind the wall, it would also have served to *1151 alert persons working in the area of these valves that a danger existed. Therefore, I find it would have been reasonable for the jury to conclude the barrier addressed in TI-84 had direct relevance even though the malfunctioning valve was an automatic one.
I likewise disagree with the majority's emphasis on the fact Air Liquide acquired ownership of the Plaquemine plant after its promulgation of TI-84. Although Air Liquide acquired ownership of the Plaquemine plant after its promulgation of TI-84, it failed to insure this plant's compliance with TI-84 even though it doubled the plant capacity after acquiring its ownership. As the jury learned, Claude Tronchon, the General Manager of Risk Management for Air Liquide, testified he was shocked to find out Air Liquide's safety director, Gerard Campion, had not audited the Plaquemine plant for compliance with Air Liquide's health and safety policies.
I find that with the promulgation of TI-84, Air Liquide assumed a key aspect of its subsidiary's duty with regard to work place safety. Albeit Air Liquide did not supplant the duty of its subsidiary to provide a safe workplace in all respects, Air Liquide's adoption of TI-84 carved out a discrete aspect of safety, namely at letdown stations, for which a subsidiary within the Air Liquide Group was given no discretion.[1] Air Liquide's wording of TI-84 lends itself to no other conclusion.
Tronchon admitted the Plaquemine plant was not following the directives of TI-84, and yet he did not attempt to remedy that situation because no accidents or explosions had occurred at a let-down station on those premises. This failure to implement TI-84 at the Plaquemine plant so that safety initiatives adopted in Europe were applied to protect these plaintiffs constitutes Air Liquide's breach of an assumed duty. The jury so found and its findings were reasonably based upon the evidence adduced.
Therefore, I find no error in the appellate court's affirmation of the jury verdict that found Air Liquide and its insurers liable to the plaintiffs for compensatory damages. Manifest error review and this Court's long line of established jurisprudence call for the affirmation of this reasonably considered jury verdict. For these reasons, I respectfully dissent.
JOHNSON, J., dissents and assigns reasons.
The majority acknowledges that the court in its original decision applied the incorrect de novo standard of review, but suggests that even if the court had applied the correct manifest error standard of review, the result would be the same.
*1152 In the case sub judice, the question before the jury was whether the parent corporation had assumed responsibility for safe working conditions at the subsidiary. The jury was presented with Air Liquid's own document, the TI 84, which clearly provided that it "sets the minimum requirements to be met throughout the AL Group ...," which included the facilities throughout the United States and included the facility in Plaquemine where this event occurred. The jury heard conflicting testimony as to ALSA's responsibility regarding safety. After hearing testimony and reviewing the evidence presented, the jury found that the parent corporation assumed liability for the safety of all employees. Jurisprudence provides that the appellate courts should defer to the findings of the jury as the jury is in a better position to evaluate the credibility of witnesses and make a factual determination than is a reviewing court. Parish National Bank v. Ott, 02-1562 (La.2/25/03), 841 So.2d 749. After reviewing the record in its entirety, there is nothing in the record to suggest that 1) a reasonable factual basis does not exist for the jury's verdict or 2) that the jury's findings are clearly wrong (manifest erroneous). After being presented with two permissible views of the evidence of whether the procedures set forth in the TI 84 were mandates, guidelines, or recommendations, the jury ruled in favor of Air Liquid's liability. Applying the manifest error standard, this ruling should not be disturbed.
For these reasons, I respectfully dissent.

On Rehearing
Rehearing not considered.
KNOLL, J., would consider the application and grant it.
NOTES
[*] Retired Judge Phillip C. Ciaccio, assigned as Associate Justice ad hoc, sitting for Associate Justice John L. Weimer, recused.
[1] The nature of the air separation business was to draw air into "air machines," where the oxygen, nitrogen, and argon is separated via a cryogenic process. The air is then liquified and sold. The core business of the Air Liquide conglomerate is to supply oxygen, nitrogen, hydrogen, and other gases and services to various industries.
[2] The purposes of the let-down station were two-fold: (1) to control the flow and pressure of gaseous oxygen into separate pipelines with different pressures, and (2) to facilitate the distribution of oxygen from the facility's oxygen backup system.
[3] After determining the cause of the flash fire, the investigators made certain recommendations, which were later promulgated as rules by Compressed Gas Association (the "CGA"), including the following:

7.1.0 [CGA] pamphlet number G-4.4, revision 1993, INDUSTRIAL PRACTICES FOR GASEOUS OXYGEN TRANSMISSION AND DISTRIBUTION PIPING SYSTEMS, should be considered the minimum acceptable standard document when designing an oxygen piping system.
. . .
7.11.0 Barrier walls must be utilized around all oxygen control valve stations in high velocity pressure reducing service. Such walls are to be designed and constructed to withstand the expected forces involved in any oxygen pipeline fire and resulting rupture.
. . .
7.13.0 Manual isolation valves, isolating pressure regulating control valves, are to be within the barrier wall. Their operating hand wheels must project and be accessible outside the barrier wall.
[4] Hracek's wife was deceased at the time of the accident.
[5] Other defendants named in the original suit were Dresser Industries, Inc., Masoneilan International, Exxon Corporation, and Highlands Insurance Company, who were subsequently dismissed from the suit.
[6] Billiot had held that employers, otherwise immune from tort liability under La. R.S. 23:1032, could be liable to their employees for punitive damages under Article 2315.3. Civil Code Article 2315.3 was added by Acts 1984, No. 335,  1, effective September 4, 1984. It was repealed by Acts 1996, 1st Ex.Sess. No. 2,  1, effective April 16, 1996. This Court overruled Billiot in Adams v. J.E. Merit Const., Inc., 97-2005 (La.5/19/98), 712 So.2d 88.
[7] Plaintiffs proceeded to trial against the utility companies. On September 24, 1997, the trial court entered judgment against the defendants, apportioning fault as follows: Big Three-20%, ALAC-40%, the utility companies-40%. The court of appeal reversed the judgment as to the utility companies. Perkins v. Entergy Corp., 98-2081 (La.App. 1 Cir. 12/28/99), 756 So.2d 388. This Court affirmed the court of appeal's ruling, holding that the plaintiffs failed to prove that the flash fire was caused by the power disturbance. 00-1372, 00-1387, 00-1440 (La.3/23/01), 782 So.2d 606.
[8] These plaintiffs also asserted Billiot claims against ALAC's liability carriers pursuant to their settlement agreement in Perkins. These claims against ALAC's insurers were dismissed with prejudice when this Court overruled Billiot in Adams on May 19, 1998.
[9] LAEC, one of ALAC's "sister corporations" built the Number 4 plant, an addition to the Plaquemine facility. In their petition for damages, plaintiffs alleged that LAEC, inter alia: (1) failed to properly design the Number 4 plant installed in the Plaquemine facility; (2) failed to properly examine the letdown station; (3) failed to require the installation of a filter in the letdown station: (4) failed to prescribe proper maintenance practices for the plant; and (5) failed to properly supervise construction at the plant.
[10] Sometimes referred to within the document as "IT 84."
[11] As the ultimate parent of plants located throughout the world, ALSA collected information about the operations of its subsidiaries and served as a clearinghouse for operational information that might be useful to other ALSA entities. This function was carried out by the "Direction Technique," an internal ALSA department that examined accident data (among other things) from various subsidiaries and periodically drafted and disseminated recommendations to all of the ALSA subsidiaries, which summarized the findings of the Direction Technique and offered suggested solutions to various operational and safety problems of potential interest to all ALSA subsidiaries worldwide.
[12] Campion was asked on cross-examination:

Q. Sir, I mean Air Liquide, S.A., the company, eventually saw to it that their subsidiaries or they themselves had walls, barrier walls, built around these let-down stations, correct?
A. Around the let-down stations, yes.
[13] The trial court granted defendants' motions for JNOV in part and reduced Perkins' awards for past mental anguish, Hracek's damages for pre-death pain and suffering and pre-death mental anguish, and Hracek's surviving children's awards. Exemplary damages were reallocated accordingly. The court granted in part the Bujol and Perkins plaintiffs' motions and reallocated the exemplary damages among the plaintiffs.
[14] The court of appeal also concluded that LAEC was not liable as it did not owe a duty to plaintiffs. The 15% fault allocated to LAEC was reallocated to ALAC, after the court of appeal concluded that the jury was clearly wrong in finding that ALAC was not at fault. Additionally, the court of appeal found no manifest error in the trial court's decision to reduce the award of the Hracek's survival action, finding that the awards of $3,000,000.00 for Hracek's pre-death pain and suffering and $2,000,000.00 for his pre-death mental anguish were abusively high.
[15] As stated in Joiner, no case has imposed upon a parent corporation a duty to control the acts of its subsidiaries. See also Fletcher v. Atex, Inc., 861 F.Supp. 242, 247 (S.D.N.Y. 1994), order aff'd, 68 F.3d 1451 (2d Cir.1995) (absent a special relationship between the parent and the subsidiary there is no duty to control the subsidiary's conduct to prevent harm to third persons).
[16] The court of appeal and the parties herein refer to this section of the Restatement as the "Good Samaritan" Doctrine. However, this characterization of this section is not to be confused with Louisiana's "Good Samaritan" Doctrine set forth in La. R.S. 9:2793, which refers to persons who gratuitously in good faith render emergency care or transportation to another.
[17] See, e.g., LeBlanc v. Stevenson, 00-0157 (La.10/17/00), 770 So.2d 766; Rick v. State Dept. of Transportation and Development, 93-1776 (La.1/14/94), 630 So.2d 1271; Blair v. Tynes, 621 So.2d 591 (La.1993).
[18] Courts have differed on exactly what the subsections of  324A determine. Some courts have held that these subsections determine the existence of a duty. See, e.g., Zabala Clemente v. U.S., 567 F.2d 1140, 1145 (1st Cir.1977) (applying  324A to hold no duty existed), cert. denied, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978); Ricci v. Quality Bakers, 556 F.Supp. 716, 720 (D.Del.1983) (holding plaintiff must establish defendant's duty under one element of  324A). Other courts have held that the subsections of  324A establish proximate cause. See, e.g., Canipe v. National Loss Control Serv. Corp., 736 F.2d 1055, 1061 (5th Cir.1984) (using subsections to find proximate cause); Patentas v. U.S., 687 F.2d 707, 716 (3rd Cir.1982) (noting that  324A specifies three circumstances in which negligent performance of undertaking may proximately cause injury). Whether used to establish a duty or proximate cause, the analysis of  324A remains the same. Annette T. Crawley, Environmental Auditing and the "Good Samaritan" Doctrine: Implications for Parent Corporations, 28 Ga. L.Rev. 223, 236, n. 69 (1993).
[19] The entire jury charges relating to defendants' liability included the following:

In this particular case, the plaintiffs allege that the defendant has committed the kind of fault which the law calls negligence, but this is only one of the elements of plaintiffs' case. And I previously told you that in order to be successful, the plaintiffs must establish all the essential elements of their case.
The other elements are the following: One, that the injury the plaintiff suffered were in fact caused by the conduct of the defendant and, two, that there was actual damage to the plaintiff's person or their property.
. . .
... In summary, let me recall to you the essence of my remarks. The plaintiff has the burden of proving the following elements by a preponderance of the evidence:
He must demonstrate, one, that the injury which he says he suffered was in fact caused by the conduct of the defendant; two, that the conduct of the defendant was below the standards which I have told you are applicable to the defendant's conduct; and, three, that there was actual damage to the plaintiff's person or his property.
If you are satisfied that the plaintiff has established these three elements, then plaintiff is entitled to recover and you should return a verdict for the plaintiff, unless the defendant has proved by a preponderance of the evidence that the plaintiff contributed to his own injury by his own substandard conduct.
[20] At the close of the case, X.L. and National Union moved for directed verdicts on the ground that plaintiffs had failed to establish any legal basis for holding ALSA liable. The district court denied defendant's motions, saying that ALSA had "assumed the responsibility of safety when they started sending those recommendations, as they called them. It's mandatory regulation. And not enforcing them." Further, during discussions regarding jury instructions, the trial judge agreed to give defendants' requested instructions on assumption of duty. However, either the trial court erroneously and inadvertently failed to give the jury as the fact-finder the proper instructions regarding voluntary assumption of duty, or, the trial court ruled as a matter of law the ALSA voluntarily undertook to perform ALAC's duty for the safety of their employees. Either way, the jury did not make a factual finding using proper jury instructions in finding that ALSA assumed ALAC's duty of safety; therefore, the manifest error rule is not appropriate under either circumstance.
[21] In refusing to premise liability solely on the basis of a parent-subsidiary relationship, the Tenth Circuit reasoned that imposing liability on such a basis would treat the parent-shareholder as an employer without providing it with the shield of employer immunity under workers' compensation laws. Love v. Flour Mills of America, 647 F.2d 1058, 1063 (10th Cir.1981).
[22] The Muniz court also relied on Davis v. Liberty Mutual Insurance Co., 525 F.2d 1204 (5th Cir.1976), where the insurer provided recommendations to aid the insured in fulfilling its duty to provide a safe workplace and occasionally assisted in safety inspections at the insured's plant. In Davis, the court held that the insurer had not assumed a duty to provide for safety at the insured's plant, because the insured did not delegate any part of its direct and primary duty to discover unsafe conditions to the insurer. 525 F.2d at 1208.
[23] Sanders v. MAPCO, Inc., 1987 WL 5895 (D.Md., 1987) (holding that "cases are uniform that the mere fact that a parent corporation is the major shareholder of a subsidiary, or that the parent provides incidental services for the subsidiary, cannot be the sole basis for liability"); accord Abdel-Fattah v. Pepsico Inc., 948 S.W.2d 381, 385 (Tx.App.1997) (parent's hiring of subsidiary's CEO was not an "undertaking" to oversee "the daily management of the employees in each and every [subsidiary] in the country.")
[24] Pomales v. Becton Dickinson & Co., S.A., 839 F.2d 1,7 (1st Cir.1988) (evidence that the parent was aware of the safety problems at subsidiary's plant, provided subsidiary with assistance in evaluating and inspecting the safety conditions, and was involved in the initial design of the plant, was insufficient proof under Muniz that "the parent corporation has assumed primary responsibility for industrial safety at [the] subsidiary corporation's plant").
[25] See Santillo v. Chambersburg Eng'g Co., 603 F.Supp. 211, 214 (E.D.Pa.1985) ("It is well-settled that under  324A negligent inspection does not meet the requirements of  324A(a)") (citing Canipe v. Nat'l Loss Control Serv. Corp., 736 F.2d 1055, 1062 (5th Cir.1984) (where the employer hired an independent safety inspection company to inspect for OSHA compliance,  324A can be satisfied if a plaintiff proves that the employer has delegated any part of its duty to discover and remedy unsafe working conditions or if, in relying on the defendant's undertaking, the employer neglects or reduces its own safety program); Patentas, 687 F.2d at 707, 717 (3rd Cir.1982) (Coast Guard not liable for negligent inspection of vessel where plaintiffs failed to prove that the negligent inspection increased the risk, i.e., meaning some physical change to the environment or some other material alteration of circumstances, and failed to prove that knowledge of the inspection induced the cargo operators to forgo other remedies or precautions against the risk); Davis v. Liberty Mut. Ins. Co., supra at 1207).
[26] La. R.S. 23:13 provides:

Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees. Nothing in this Section shall apply to employment in private domestic service or to agriculture field occupations.
[27] Love, supra at 1063 ("When the only negligence alleged against the shareholder owner of a corporation is failure to see that directors take appropriate safety measures, the same policy that frees directors and officers from personal tort liability to worker injured on the job is necessarily applicable to shareholders."); Maki v. Copper Range Company, 121 Mich.App. 518, 328 N.W.2d 430 (1982) ("To hold a parent corporation responsible for injuries to employees of the subsidiary merely because of the control inherent in the parent-subsidiary relationship would destroy the long established protection afforded shareholders by incorporation."); Joiner v. Ryder System, Inc., 966 F.Supp. 1478, 1489 (C.D.Ill.1996) (noting that arguments to hold parent corporations accountable for a subsidiary's torts merely on the basis of the parent's right, power or ability to control the subsidiary are not tenable).
[28] The only evidence presented about the benefits of a wall around the valve in this case was that perhaps the workers would not have approached the valve as closely if a wall had been placed around it.
[29] Plaintiffs' argument that the addition of Plant # 4 increased the oxygen production at the plant and therefore increased the pressure at the automatic valve at issue does not meet this requirement. That section clearly speaks of the undertaking increasing the risk, and the addition of Plant # 4 had nothing to do with the undertaking.
[30] Plaintiffs cite Canipe v. Nat'l Loss Serv. Corp., supra at 1062-63 for the proposition that subsection (b) only requires that "the party who owes the plaintiff a duty of care has delegated to the defendant any particular part of that duty," such "supplementing" the subsidiaries duty, rather that "supplanting" that duty is sufficient. However, while  324A(b) might be met if a parent only takes over one aspect of the subsidiary's duty to provide a safe workplace, such as for instance the safety for a particular piece of equipment rather than the safety of the entire plant, it is still necessary that the parent supplant the subsidiary's duty with respect to that aspect completely.
[31] The court of appeal relied solely on Miller v. Bristol-Myers Company, 168 Wis.2d 863, 485 N.W.2d 31 (Wis.1992), to support its holding that ASLA assumed ALAC's duty for safety under  324A, although it is unclear upon what basis, i.e.,  324A (a), (b), or (c), the court found ALSA to be liable, as they cited quotations from Miller dealing with both (a) and (b). 833 So.2d at 965. In any event, we disagree with the court of appeal's application of Miller to conclude that ALSA assumed a duty owed by the subsidiary to provide a safe workplace. The facts of Miller indicate that the parent exercised significant authority over the subsidiary in affecting changes in safety-related and other day-to-day matters, known as "line authority," exercised the power to compel the subsidiary to comply with the parent's safety mandates, and exercised financial control over the subsidiary's ability to install safety related equipment, etc. In addition, the parent physically inspected the subsidiary's plant, made a detailed audit of the safety features needed in the particular place where the accident occurred, and the subsidiary was mandated to follow the audit's requirements. To the contrary, the evidence was clear that ALSA exercised no financial control over ALAC's spending, exercised no authority to compel ALAC to implement any suggested safety recommendations, and had never physically audited or inspected the plant, or the valves involved in the accident, prior to the accident or made recommendations specific to that plant.
[32] The article was repealed in 1996, but "only as to causes of action which arise on or after the effective date hereof." La. Acts 1996, 1st Ex.Sess., No. 2,  1.
[1] The court of appeal and the parties herein refer to this section of the Restatement as the "Good Samaritan" Doctrine. However, this characterization of this section is not to be confused with Louisiana's "Good Samaritan" Doctrine set forth in LSA R.S. 9:2793, which provides:

A. No person who in good faith gratuitously renders emergency care, first aid or rescue at the scene of an emergency, or moves a person receiving such care, first aid or rescue to a hospital or other place of medical care shall be liable for any civil damages as a result of any act or omission in rendering the care or services or as a result of any act or failure to act to provide or arrange for further medical treatment or care for the person involved in the said emergency; provided, however, such care or services or transportation shall not be considered gratuitous, and this Section shall not apply when rendered incidental to a business relationship, including but not limited to that of employer-employee, existing between the person rendering such care or service or transportation and the person receiving the same, or when incidental to a business relationship existing between the employer or principal of the person rendering such care, service or transportation and the employer or principal of the person receiving such care, service or transportation. This Section shall not exempt from liability those individuals who intentionally or by grossly negligent acts or omissions cause damages to another individual.
B. The immunity herein granted shall be personal to the individual rendering such care or service or furnishing such transportation and shall not inure to the benefit of any employer or other person legally responsible for the acts or omissions of such individual, nor shall it inure to the benefit of any insurer.
Certainly, a person who renders emergency care or aid to a stranger is incomparable to a parent corporation issuing safety mandates to subsidiary corporations.
[2] The CGA published a pamphlet entitled, INDUSTRIAL PRACTICES FOR GASEOUS OXYGEN TRANSMISSION AND DISTRIBUTION PIPING SYSTEMS, which contained "a summary of the current industrial practices used in gaseous oxygen transmission and distribution piping systems...." The document stated in pertinent part:

This document is not intended to be a mandatory standard or code. It is based upon the combined knowledge, experience, and practices of the major oxygen producers in this country as represented by their members on the CGA Pipeline Committee.
CGA pamphlet number G-4.4, revision 1993, p. 5, INDUSTRIAL PRACTICES FOR GASEOUS OXYGEN TRANSMISSION AND DISTRIBUTION PIPING SYSTEMS.
[3] The IGC is the European counterpart of the CGA, and it is charged with the task of setting the industrial practices in Europe.
[*] Judge Philip C. Ciaccio, retired, sitting pro tempore, for Justice John L. Weimer, recused.
[1] Absent a finding that the trier of fact applied the incorrect law because of erroneous and prejudicial jury instructions, the court of appeal should not upset a jury verdict unless it finds that it is manifestly erroneous or clearly wrong. See Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). When an appellate court finds prejudicial error that has affected the factfinding process at trial, the jury verdict is not due any deference, de novo review applies and the appellate court is at liberty to make an independent decision based on the record evidence.
[2] Restatement [Second] of Torts  324A provides as follows:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [perform] his undertaking, if
(a) his failure to exercise reasonable care increases the risk of harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
[1] The mere fact that Air Liquide is the ultimate parent corporation of Air Liquide America does not impose a duty upon Air Liquide to provide Air Liquide America's employees with a safe place to work. Louisiana law has been clear that a corporation is a distinct legal entity apart from its shareholders and the shareholders of a corporation organized after January 1, 1929, shall not be personally liable for any debt or liability of the corporation. Buckeye Cotton Oil Co. v. Amrhein, 168 La. 139, 121 So. 602 (La.1929); LA.REV.STAT. ANN.  12:93(B). Although the jurisprudence shows no case has imposed upon a parent corporation a duty to control its subsidiary's acts, Joiner v. Ryder System Inc., 966 F.Supp. 1478, 1483 (C.D.Ill.1996), the present case involves an instance of a party who voluntarily undertakes a task that he otherwise has no duty to perform. To this extent, I take no exception to the majority's general statement that a duty is not automatically imposed on a parent company.